ESPERANZA PEACE AND JUSTICE CENTER, a Non–Profit Corporation, The San Antonio Lesbian & Gay Media Project, an Unincorporated Association, and VAN, an Unincorporated Association, Plaintiffs,

v.

CITY OF SAN ANTONIO, and Howard Peak, in his official capacity as Mayor of the City of San Antonio, Defendants.

No. SA–98–CA–0696–OG.

United States District Court, W.D. Texas, San Antonio Division.

May 15, 2001.

Amy H. Kastely, Center for Legal and Social Justice; Mary A. Kinney, Lawyers' Committee for Civil Rights; Carol Bertsch, Attorney at Law; and Isabel Cristina de la Riva of Wilson, Trevino, Freed, Valls & Trevino, LLP; all of San Antonio, TX, for Plaintiffs.

Michael Patrick Hodge and Amy M. Eubanks, both with the Office of the City Attorney, San Antonio, TX, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ORLANDO L. GARCIA, District Judge.

This case was tried to the Court on August 21 and 22, 2000. After considering the pleadings, the evidence presented, the arguments of counsel, the post-trial briefs (docket nos. 163, 167, and 171), and the controlling legal authority, the Court enters its findings of fact and conclusions of law in accordance with FED. R. CIV. P. 52.

The Court has federal question jurisdiction. 28 U.S.C. §§ 1331, 1367, 2201 and 2202.

Plaintiffs are organizations engaged in the arts, and in cultural and educational activities in San Antonio and Bexar County. They brought this suit when the San Antonio City Council voted to discontinue their funding in its fiscal year 1997–98 budget at its meeting on September 11, 1997. The City subsequently voted not to fund plaintiffs in its fiscal year 1998–99 budget as well. Plaintiffs bring three causes of action under 42 U.S.C. § 1983, alleging that: (1) the City committed viewpoint discrimination in violation of their free speech rights under the First Amendment; (2) the City committed animus-based discrimination in violation of their equal protection rights under the Fourteenth Amendment; and (3) the City retaliated against plaintiffs after they filed the present suit by denying their funding in the 1998–99 budget in violation of their First Amendment rights to petition the government and to free expression. Plaintiffs bring a fourth cause of action under the Texas Open Meetings Act alleging that the City violated the Act when council members informally deliberated regarding the budget and plaintiffs' funding in a closed meeting or series of meetings the evening prior to the September 11, 1997 public meeting. Plaintiffs are "persons" entitled to sue under 42 U.S.C. § 1983.

As will be explained below, defendants' decision to eliminate plaintiffs' funding constituted viewpoint discrimination in violation of the First Amendment, and a violation of plaintiffs' Fourteenth Amendment equal protection rights. Defendants did not retaliate against plaintiffs based on their filing of this lawsuit. Defendants violated the Texas Open Meetings Act, and their attempted ratification at the September 11, 1997 meeting was ineffective.

### I. Factual background.

Plaintiff Esperanza Peace and Justice Center ("Esperanza") is a non-profit cultural arts and education center located in San Antonio, and incorporated as a non-

profit organization under the law of Texas. Esperanza, founded in 1987, offers programming in visual arts, music, film, video, and cultural studies, as well as space and assistance to many local organizations and artists.[1] Esperanza's mission statement says:

> The people of Esperanza dream of a world where everyone has civil rights and economic justice, where the environment is cared for, where cultures are honored and communities are safe. The Esperanza Center advocates for those wounded by domination and inequality— women, people of color, lesbians and gay men, the working class and poor. We believe in creating bridges between people by exchanging ideas and educating and empowering each other. We believe it is vital to share our visions of hope ... we are *esperanza.*[2]

Esperanza's Strategic Plan includes the following goals:

> (1) To provide programming which generates multi-issue/multicultural community organizing while providing resources and space where the creation and presentation of the arts reflect the culture of people in struggle; (2) To construct, develop, and operate a permanent, safe, central, multi-purpose facility for artists, activists and other community members to do their work with a sense of community, history, quality, and hope; (3) To generate a consistent source of diversified income to support the goals and objectives of the organization.[3]

Esperanza's arts programming includes both seasonal programming and on-going skills-development projects.[4] Its seasonal programming, called *"PazARTE,"* includes the "Other America Film Festival," presenting films about communities and issues throughout the Americas, literary events and musical performances.[5] The intent is to give voice to those who usually do not have access to art, including women, poor people, and people of color.[6] The on-going, skills-development projects of Esperanza include *"MujerArtes,"* a Westside community-arts economic-empowerment project in which low-income women develop their artistic skills and produce pottery for sale,[7] and *"Puentes de Poder,"* a program bringing together different communities to tell their stories and break down stereotypes.[8]

Plaintiff San Antonio Lesbian & Gay Media Project ("Media Project") is an unincorporated association formed for the purpose of promoting fair, accurate, and inclusive media images and portrayals of lesbians, gay men, bisexuals and transgendered persons.[9] Since 1992, the Media Project has presented "Out at the Movies," a lesbian and gay film festival, the aim of which is to exhibit contemporary lesbian and gay film and video, to demonstrate the diversity of national and international lesbian and gay cultures (including films and videos from a variety of age, nationality, language, gender, religious, and historical perspectives), to increase discussion of current social issues within lesbian and gay communities, and to promote understand-

1. TR 77; 80–82; 86–88.

2. PX 14. *"Esperanza"* is Spanish for "hope."

3. PX 13.

4. PX 99, TR 80–83.

5. TR 81–82.

6. TR 82.

7. TR 83–84.

8. TR 86.

9. PX 23, TR 143–44.

ing within public media organizations.[10] Plaintiff VANN is an unincorporated association formed for the purpose of bringing national and international artists who are visiting or working in other parts of Texas to San Antonio for programs and networking.[11]

Defendants are the City of San Antonio and its mayor, Howard Peak. They will sometimes be referred to collectively as "the City."

## A. 1997 funding decision.

Since 1990, arts funding for the City of San Antonio has been vetted through the Department of Arts and Cultural Affairs (DACA),[12] for which the city council appoints an eleven-member Cultural Advisory Board (CAB). DACA was created in the City's 1988–89 budget to provide a full-service arts department for the City.[13] The DACA Strategic Plan, which was adopted by the city council in 1993 (and amended by the city council periodically thereafter), provides the goals and general guidelines for allocating competitive arts grants to outside agencies.[14] The DACA Strategic Plan establishes three criteria for evaluating arts funding applications: artistic excellence, audience development, and administrative capacity.[15] These criteria are consistent with most government arts funding programs.[16] The DACA Strategic Plan emphasizes the goals of funding agencies that provide diverse programming and reach traditionally underserved groups, and support programs that address social issues such as "AIDS, youth issues such as gangs and drugs, education, and the homeless population."[17]

In 1996, 1997, and 1998, the City distributed Guidelines and Application Forms to be used by outside agencies in their applications for City arts funding. These Guidelines and Application Forms were approved by the city council each year.[18] The Guidelines and Application Forms distributed in these years informed prospective applicants of the goals behind the City's arts funding program and the process and criteria that would be used in evaluating the applications, as defined in the Strategic Plan.[19]

The Strategic Plan provides that applications for arts grants should be submitted to DACA and evaluated by the staff and by peer panels representing various artistic disciplines. The peer panels, selected by CAB, include arts professionals, experts experienced with arts organizations, and arts patrons.[20] The peer panels discuss the applications in open meetings and, using the Strategic Plan guidelines, rank the applications and make recommendations to CAB for awarding grants to applicants. Peer-panel chairpersons, DACA staff members, and the applicants then present the applications to CAB in an open meeting for discussion and final recommendations.[21] Upon receiving DACA's

10. PX 23, TR 144–45.

11. TR 172, 175.

12. DACA is now known as the Office of Cultural Affairs.

13. Undisputed Fact 3. The undisputed facts are set out in the pretrial order.

14. PX 104, 105, 107; Undisputed fact 5.

15. PX 3, 104; Undisputed fact 6.

16. TR 8.

17. PX 104, pp. 3, 9; Undisputed facts 7 and 8.

18. PX 7, 19, 62; Undisputed fact 9.

19. PX 7, 19, 62; Undisputed fact 10.

20. TR 8–9; PX 2, 104; Undisputed fact 11.

21. PX 2; Undisputed fact 12.

recommendations, CAB holds public meetings, makes preliminary funding recommendations, and issues final funding recommendations to DACA's director.[22] The final recommendations are then presented to the City Manager by DACA's Director as part of DACA's budget.[23] In order to obtain grant monies, the City represented to state and federal authorities that the City's arts funding decisions would be made based on the process set out in the Strategic Plan.[24]

The City has neither created nor operated the arts funding program to convey a specific message of its own; rather, the City created an arts funding program because it recognized that art was important for matters of quality of life and economic development.[25] There is no City requirement that an applicant be exclusively involved in arts activities in order to qualify for City arts grants: the City can award grants to agencies that do not focus exclusively on arts as long as the activity that they were seeking support for had an arts or cultural purpose.[26] The City encouraged outside agencies to connect art and social issues: arts programming funded through the DACA granting program may include work addressing or involving social and political concerns.[27] The City, through the DACA granting program, has funded both organizations that do not have art as their sole focus and organizations

that present arts and cultural programs that address social issues.[28]

Esperanza applied for and received funding in the form of both operational-support and project-support arts grants from the City beginning in fiscal year 1990–91 and continuing through fiscal year 1996–97.[29] Beginning in fiscal year 1994–95, Esperanza acted as sponsor and fiscal agent for the Media Project.[30] Esperanza also served as sponsor and fiscal agent for VAN in its applications for grants from the City.[31] The City Council and the Texas Commission on the Arts have approved grants of arts funding to unincorporated organizations using the sponsor/fiscal agent process.[32] From fiscal year 1994–95 through fiscal year 1996–97 the Media Project received project-support arts grants from the City.[33]

In 1996, Esperanza applied for a two-year operational-support grant for its *PazARTE* programming.[34] The *PazARTE* programming is Esperanza's primary seasonal arts programming and includes such annual events as *MujerCanto*, featuring women's performance, music, song, and thought; *Platicas*, a community forum for artists and other speakers; the "Other America Film Festival," presenting films about communities and issues throughout the Americas; and *Exhibiciones Activas*, a series of art exhibits featuring art by women, people of color, youth, lesbians and gays, and other disenfranchised voices.[35]

22. TR 9.

23. PX 2; TR 9, 12; Undisputed fact 12.

24. TR 45, 66.

25. TR 5.

26. PX 7, 19, 62; TR 5; Undisputed fact 15.

27. PX 104; TR 13; Undisputed fact 16.

28. TR 38; Undisputed fact 17.

29. TR 93–94; Undisputed fact 20.

30. TR 88; Undisputed fact 18.

31. TR 88; Undisputed fact 18.

32. Undisputed fact 19.

33. TR 142, 145–147; Undisputed fact 20.

34. PX 8.

35. PX 8; TR 94; Undisputed fact 21.

Esperanza's 1996 operational-support grant was ranked number one in its category by the peer-review panel, received a numerical score that placed it high among all applicants for arts funding, and was recommended for funding by CAB and DACA staff.[36] This grant was included in the City's fiscal year 1996–97 annual budget, as an award of $44,100 for the first year of the operational grant, fiscal year 1996–97.[37] The second year was to have been fiscal year 1997–98.[38] Although Esperanza was a co-sponsor of the "Out at the Movies" film festival, this film festival was not a part of Esperanza's operational-support or project-support grant applications to the City. None of the money received from the City was used by Esperanza for "Out at the Movies"; only the Media Project applied for and received a grant to support the "Out at the Movies" film festival.[39]

For fiscal year 1997–98, each plaintiff applied for and DACA recommended City arts-funding grants to the plaintiffs totaling $62,531 (the "1997 proposed grants"), which appeared in the proposed city budget as an allocation to Esperanza.[40] The 1997 proposed grants included a $44,100 operational grant to Esperanza, as funding for the second year of Esperanza's two-year operational grant; a $11,746 project grant to Esperanza for its *Visiones de Esperanza* Project; a $5,326 project grant for the Media Project for its "Out at the

Movies" film festival; and a $1,359 project grant for VAN.[41] All plaintiffs satisfied the eligibility requirements for City arts-funding grantees for fiscal year 1997–98.[42] Plaintiffs were among numerous outside agencies recommended for arts-funding grants in the proposed fiscal year 1997–98 budget.[43]

In 1997, seven new members were elected to the San Antonio City Council.[44] The majority of the council came with a mandate from voters for a "back to the basics" budget.[45] The arts were not a priority; many council members sought to allocate as much money as possible to basic services such as police, fire, EMS, streets, and so on, and one or two council members were in favor of cutting arts programs entirely.[46]

The arts in general were subject to a considerable amount of controversy during the City's 1997 budget process. Esperanza, along with other arts groups including the Alamo City Men's Chorale, Jump Start Performance Co., and the Guadalupe Cultural Arts Center ("the Guadalupe" or "the Guadalupe Center"), were targeted by certain conservative groups who opposed their perceived advocacy of the "gay and lesbian lifestyle," but none were the target of a lobbying effort as extensive or as vicious as that leveled against Esperanza.[47] During August and early September 1997, Christian talk-radio host Adam McManus undertook radio and

36. TR 94; Undisputed fact 22.

37. TR 94; Undisputed fact 22.

38. PX 8, 10; TR 94–95; Undisputed fact 22.

39. PX 8, 20, 22; TR 95.

40. PX 20, 21, 22, 24, 30; Undisputed fact 24.

41. PX 30; Undisputed facts 25–28.

42. TR 31; Undisputed fact 37.

43. PX 30; Undisputed fact 31.

44. TR 244–45.

45. TR 246; 299; 360; 381; 471–72; and 493.

46. TR 244, 271, 299, 303, 306, 360, 385, 421–22, 471, 493.

47. PX 31, 82; TR 139, 207–09, 304, 354; McManus deposition 72–73, 75–76; Undisputed facts 38–44.

lobbying efforts to oppose City funding for Esperanza.[48] City council members Robert Marbut, Jose Menendez, Rick Vasquez, and Ed Garza were interviewed on McManus's radio program during August and September of 1997.[49] During McManus's radio broadcasts, McManus, his guests, and his listeners expressed their negative attitudes toward Esperanza and their strong opposition to arts funding for Esperanza, based primarily on its co-sponsorship of the "Out at the Movies" film festival.[50] Criticism of Esperanza expressed during the McManus shows in 1997 was similar to that expressed during McManus's 1998 programs opposing funding for the Esperanza.[51] During August 1997, Martha Breeden, Executive Director of the Christian Pro–Life Foundation, sent a flyer to approximately 1,200 people on the Christian Pro–Life Foundation mailing list urging opposition to City funding for Esperanza because she opposed the City funding a gay and lesbian program.[52] Only Esperanza was named in the flier. Council members received the flier that Ms. Breeden distributed.[53] The calls, letters, e-mail and other communications opposing funding that council members received in 1997 typically focused on a "homosexual agenda," "deviant lifestyle," and similar references.[54] Other than knowing of the existence of the "Out

at the Movies" film festival, opponents had limited knowledge of plaintiffs' arts programming and activities.[55]

Most council members received letters and phone calls regarding funding for the plaintiffs and were aware of the opposition to it voiced by some members of the public.[56] During a conversation with representatives of Esperanza on September 9, 1997, Council Member Tim Bannwolf said that the phone calls he had been receiving opposing funding for the plaintiffs had been mean and vicious in nature, and that callers had threatened to vote against him and have their families, neighbors, and churches vote against him if he voted to fund plaintiffs.[57] The majority of the eleven council members had no personal knowledge regarding Esperanza or its programming beyond what they were told by constituents or gathered from news reports; only two had limited personal knowledge of Esperanza's programming.[58] No city council members reviewed the plaintiffs' funding applications.[59] No council member had personal knowledge of the Media Project, or VAN, or that they were separate from Esperanza, and no council member understood that the proposed budget allocation for Esperanza included project grants for the Media Project or

**48.** McManus deposition 44, 55–56, PX 55; Undisputed facts 38, 40.

**49.** TR 267; McManus deposition 42–44.

**50.** TR 135; McManus deposition 82; Undisputed fact 40.

**51.** PX 90–95; TR 135.

**52.** PX 31, TR 178–79; 185; 188–89; Undisputed fact 39.

**53.** TR 232; 287.

**54.** PX 32, 33, 82; TR 231; 264–66; 338–39; Undisputed fact 42.

**55.** PX 30, 31; TR 183; 191; 518; McManus deposition 19, 28–29.

**56.** TR 231, 264, 287, 338–39, 404–05, 443, 512; Undisputed facts 41, 43; PX 82.

**57.** TR 154.

**58.** TR 227, 261, 285–86, 335–37, 373–75, 391–94, 429–30, 438–41, 467, 494.

**59.** TR 261, 285–86, 289–90, 336–37, 373, 374–76, 393, 438, 439, 441, 465, 467.

VʌN.[60]

On the night of September 10, 1997, the eve of the budget vote, the Mayor met in the City Manager's office with several council members and spoke with other council members on the telephone to discuss the budget.[61] The Mayor's purpose was to achieve a consensus on changes to the budget, and he believed he had succeeded when he left City Hall that night.[62] This consensus was reflected in a memorandum ("consensus memorandum") dated September 11, 1997, which was signed by the mayor and all council members prior to the formal vote on the budget.[63]

On September 11, 1997, the city council approved the budget reflected in the consensus memorandum in an open meeting that contained no funding for Esperanza, the Media Project, or VʌN.[64] Council members did not discuss the elimination of funding for Esperanza during the September 11 meeting or at any prior public meeting.[65] Of the organizations recommended for arts funding in the proposed annual budget for fiscal year 1997–98, plaintiffs were the only organizations whose funding was completely eliminated in the adopted budget.[66] All other arts grantees received a 15 percent across-the-board cut, except for organizations geared toward providing services to youth and children, which were not cut for the most part.[67] Prior to the fiscal year 1997–98 budget decision, the city council had never

before eliminated all funding for a particular agency that had been recommended by DACA; rather, DACA funding recommendations were altered solely by across-the-board changes.[68] Neither DACA nor the council has ever denied funding for a properly and timely submitted second-year application for a two-year operational grant, other than the 1997 defunding of Esperanza.[69]

In the same budget that provided no funding for plaintiffs, the council approved arts funding for a number of organizations that were not primarily arts organizations, including Bexar County Detention Ministries, Jewish Community Center, Witte Museum, Social Health and Research Center, and Trinity Episcopal Church.[70] As with plaintiffs, the programs approved for funding were arts programs.[71] The council approved funding for the Witte Museum, "primarily a natural history and science museum," for just under $300,000—a substantial portion of the entire funds available for all arts funding.[72] The same budgets that defunded plaintiffs also funded organizations that included the following social and political goals in their mission statements: Musicians Society of San Antonio ("to secure improved wages, hours, working conditions and other economic advantages for the professional musicians in membership through collective bargaining"); the Inner City Cultural Arts Program ("to allow residents of the target

60. TR 227, 261, 285–86, 337, 373–74, 391–92, 438–40, 467.

61. Undisputed fact 47.

62. TR 411, 415, 425–26.

63. PX 35.

64. PX 36; Undisputed fact 50.

65. PX 51–53; Undisputed fact 45.

66. PX 30, 36, Undisputed fact 32.

67. TR 32.

68. TR 20–22, 34, 41; Undisputed fact 33.

69. TR 17; Undisputed fact 23.

70. DX 61; TR 39–40.

71. TR 39–40.

72. PX 36; TR 40, 348–49.

area to document and preserve the history, culture and social issues of the westside of San Antonio"); the Witte Museum ("the Witte Museum's core ideology is to improve people's lives"); Say Sí ("Say Sí is an arts program that trains inner-city high school students in the visual arts with a focus towards the development of business and entrepreneurial skills"); the Social and Health Research Center ("The purpose of the research center is to reduce the high rates of diabetes among Mexican Americans"); Southtown/Spart$ ("bringing to our one square mile community, the necessary businesses, jobs and services to sustain a vibrant neighborhood"); Jewish Community Center ("established for the social, educational and recreational needs of the greater community").[73] After September 11, 1997, DACA determined that the plaintiffs would not receive the Texas Commission on the Arts funds previously allocated to plaintiffs by DACA for fiscal year 1997–98 because of the city council's vote eliminating plaintiffs' funding.[74]

Plaintiffs filed this lawsuit on August 4, 1998 based on the decision to defund.

## B. 1998 funding decision.

In 1998, Esperanza applied for a three-year operational grant for its *PazARTE* programming in the amount of $100,000, and a project grant for *Visiones de Esperanza* in the amount of $40,000 for fiscal year 1998–99. Each application was favor-

ably evaluated by DACA peer panels.[75] Also for the 1998–99 fiscal year, the Media Project applied for and received a favorable peer panel recommendation for a project grant for "Out at the Movies 1998." [76] After discussion, CAB recommended a three-year operational grant of $20,000 per year and a project grant of $2,000 for the Esperanza Center, but nothing for the Media Project.[77] Both Esperanza and the Media Project satisfied the eligibility requirements for arts funding grantees in fiscal year 1998–99.[78]

As in 1997, community opposition to funding for Esperanza was strong. Mc-Manus mounted another campaign, and council members received numerous calls, e-mails, and other communications regarding arts funding for Esperanza.[79] The calls, letters, e-mail, and other communications opposing funding for Esperanza that council members received in 1998 typically focused on a "homosexual agenda," "deviant lifestyle," and other references to lesbians and gay men.[80] Other than the "Out at the Movies" film festival, opponents had limited knowledge of Esperanza's arts programming and activities.[81] While other arts organizations had experienced nominal opposition to their funding, none were the target of a lobbying campaign as extensive as that leveled against Esperanza in 1998.[82] CAB voted to withdraw its funding recommendation for Esperanza because of the City's policy not to fund

---

**73.** Defendants' Submission of Summaries of 1997–98 and 1998–99 Art Grant Applications.

**74.** Undisputed fact 51.

**75.** PX 63, 65, 66, 112; TR 114; Undisputed fact 52.

**76.** Undisputed fact 55.

**77.** PX 88; Undisputed fact 54.

**78.** Undisputed fact 66.

**79.** Undisputed Facts 67, 68.

**80.** Undisputed fact 70.

**81.** Undisputed fact 71.

**82.** PX 31, 78; TR 99, 110–12, 122, 139, 188–89, 231, 264, 304, 344, 493–94; McManus depo. 75–76.

organizations litigating against it.[83] On September 17, 1998, the city council met to consider the proposed budget, and unanimously approved a budget that did not include funding for Esperanza or the Media Project.[84]

All of the programming for which plaintiffs sought City arts funding in 1997 and 1998 is arts programming.[85] Much of Esperanza's programming, including its arts programming, focuses on social justice issues, including immigration, human rights, racism, AIDS, women's rights, homophobia, bilingual education, cultural diversity, child abuse, homelessness, and many other issues.[86]

Additional findings of fact pertaining specifically to a particular cause of action will be set forth in the discussion of that cause of action.

## II. Viewpoint discrimination.

### A. "[G]overnment may not regulate speech based on ... the message it conveys." [87]

■ "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). Thus, Justice Jackson, writing for the Supreme Court at a time when our country and free institutions around the world faced perhaps their gravest crisis, eloquently and succinctly articulated a fundamental First Amendment principle—that government may not proscribe speech or expressive

conduct because it disapproves of the ideas expressed.

This constitutional prohibition against "viewpoint discrimination" was recognized at least as early as *Hague v. CIO,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), where the Supreme Court struck down an ordinance governing the issuance of permits to speak on public streets. The Court noted that the broad discretion granted city officials under the law could, "as the record discloses, be made the instrument of arbitrary suppression of free expression of views on national affairs." *Id.* at 516, 59 S.Ct. 954. Four years later, in *Barnette,* the Court reaffirmed this principle. In that case, the Court invalidated West Virginia's compulsory flag-salute requirement as unconstitutional viewpoint discrimination, overruling its previous decision upholding public school regulations requiring children to salute the flag and recite the pledge of allegiance. 319 U.S. at 642, 63 S.Ct. 1178.

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

*Id.,* at 638, 63 S.Ct. 1178.

The prohibition against viewpoint discrimination, and the requirement of its

---

**83.** TR 115–16; PX 96; Undisputed fact 63.

**84.** PX 98.

**85.** TR 29, 31–32; Undisputed fact 29.

**86.** PX 8, 13, 14, 20, 21; Undisputed fact 30.

**87.** *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 828, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).

converse, viewpoint neutrality, arise from fundamental First Amendment values. Government action that prohibits speech based on its viewpoint threatens core First Amendment values such as freedom of thought, freedom of speech, fostering intellectual and spiritual growth, a robust exchange of ideas necessary to a properly functioning democracy, and the ability to self-govern. *See Pacific Gas and Elec. Co. v. Public Utilities Comm'n of Calif.*, 475 U.S. 1, 8, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (constitutional guarantee of free speech protects the public's interest in receiving information by protecting from government attack those who wish to enter the marketplace of ideas); *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95–96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) ("[t]o permit the continued building of our politics and culture, and to assure self-fulfillment for each individual, our people are guaranteed the right to express any thought, free from government censorship"); *Cohen v. California*, 403 U.S. 15, 24, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) ("[the First Amendment] put[s] the decision as to what views shall be voiced largely into the hands of each of us . . . in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests"); *Cox v. Louisiana*, 379 U.S. 536, 551, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) (Black, J., concurring) ("[Viewpoint-based regulation is] censorship in a most odious form . . . ."); *Kingsley Intern Pictures Corp. v. Regents of the Univ. of N.Y.*, 360 U.S. 684, 688, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959) (banning film because it advocates unconventional idea "str[ikes] at the very heart of constitutionally protected liberty"). *See also* Laura V. Farthing, Note, *Arkansas Writers' Project v. Ragland: The Limits of Content Discrimination Analysis*, 78 GEO. L.J.1949, 1953 (1990) (asserting that content-based discrimina-

tion threatens three First Amendment interests: "the preservation of free debate in order to promote self-government; the safeguarding of the individual and the communal search for truth; and the guarantee of the individual's right to free expression").

All these treasured values are imperiled when government manipulates or "skews" the public debate by subsidizing favored viewpoints. *See Texas v. Johnson*, 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) ("[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"); *Boos v. Barry*, 485 U.S. 312, 318, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) ("[T]he First Amendment reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust and wide-open' ") (quoting *New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

> At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence. Our political system and cultural life rest upon this ideal. Government action that stifles speech on account of its message, or that requires the utterance of a particular message favored by the Government, contravenes this essential right. Laws of this sort pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion.

*Turner Broadcasting Sys. Inc. v. FCC*, 512 U.S. 622, 641, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (citations omitted). Thus, as

the Supreme Court recently reaffirmed, "[i]t is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). The specter of government as "Big Brother" doling out subsidies based on the viewpoints of the recipients should be odious to all Americans, for the point of view officially favored today may be the one censured tomorrow. When dissenting voices are silenced, the public is deprived of their distinctive viewpoint, and thereby inhibited from arriving at its own conclusions uninfluenced by the government's selection of acceptable points of view. As Justice Souter reasoned, "the prohibition on viewpoint discrimination serves that important purpose of the Free Speech Clause, which is to bar the government from skewing public debate" by "allow[ing] one message while prohibiting the messages of those who can be reasonably expected to respond." *Id.* at 894, 115 S.Ct. 2510 (Souter, J., dissenting).

Discrimination against speech because of its message is presumed to be unconstitutional. *Rosenberger*, 515 U.S. at 828, 115 S.Ct. 2510; *Turner Broadcasting System*, 512 U.S. at 641–43, 114 S.Ct. 2445. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Mosley*, 408 U.S. at 95, 92 S.Ct. 2286. "Viewpoint discrimination is censorship in its purest form," *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 62, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (Brennan, J., dissenting), and requires particular scrutiny, in part because such regulation often indicates a legislative effort to skew public debate on an issue. *See, e.g., Schacht v. United States*, 398 U.S. 58, 63, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970)(federal statute permitting actor portraying an Armed Forces member to wear uniform if the portrayal did not tend to discredit that armed force invalidated because it left Americans free to praise the war in Vietnam but punished persons opposing it); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 785–786, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (striking down state statute forbidding corporations from spending money to influence public referenda on taxation noting that "[e]specially where . . . the legislature's suppression of speech suggests an attempt to give one side of a debatable public question an advantage in exposing its views to the people, the First Amendment is plainly offended"). *See also, Rosenberger*, 515 U.S. at 837, 115 S.Ct. 2510 (public university's student activities funds may not be disbursed on viewpoint-based terms); *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393–94, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (after-hours access to public school property may not be withheld on the basis of viewpoint); *Pacific Gas & Elec. Co.*, 475 U.S. at 12–13, 106 S.Ct. 903 (government-mandated access to public utility's billing envelopes must not be viewpoint based); *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others").

■ In *National Endowment for the Arts v. Finley*, 524 U.S. 569, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998), the Supreme Court made clear that the First Amendment forbids "invidious viewpoint discrimination" in the arts subsidy context. "Even in the provision of subsidies, the government may not '[a]im at the suppression of dangerous ideas.'" *Id.* at 586, 118 S.Ct. 2168 (citations omitted). *See also Speiser v. Randall*, 357 U.S. 513, 519, 78 S.Ct.

1332, 2 L.Ed.2d 1460 (1958) (striking down California law requiring loyalty oath as condition for veterans' tax exemption because it would "necessarily . . . force individuals into political silence," and "is 'frankly aimed at the suppression of dangerous ideas.'"(quoting *American Communications Ass'n v. Douds*, 339 U.S. 382, 402, 70 S.Ct. 674, 94 L.Ed. 925 (1950))). The clearest example of viewpoint discrimination is that alleged here: the denial of government funding because the applicant espouses an unpopular, controversial, or uncommon viewpoint. *See, e.g., Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510 (defining "viewpoint" as "the specific motivating ideology or the opinion or perspective of the speaker"); *see also Lamb's Chapel*, 508 U.S. at 393, 113 S.Ct. 2141 (finding viewpoint discrimination where school "permit[ted] school property to be used for the presentation of all views about family issues and child rearing except those dealing with the subject matter from a religious standpoint"); *R.A.V. v. St. Paul*, 505 U.S. 377, 384, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (government may not "proscrib[e] only libel critical of the government"). A decision to refuse all funding to an applicant because of disapproval of one program or presentation is a form of viewpoint discrimination. See *Brooklyn Institute of Arts and Sciences v. City of New York*, 64 F.Supp.2d 184, 200 (E.D.N.Y. 1999) (city committed viewpoint discrimination when it withheld already appropriated arts funding because museum refused to discontinue plans for art exhibit that mayor thought was "sick," "disgusting," and "offensive"); *Cuban Museum of Arts and Culture, Inc. v. City of Miami*, 766 F.Supp. 1121, 1129 (S.D.Fla.1991) (city's decision to withhold support for Cuban Museum because of exhibition and auction that included works by artists who were either living in Cuba or who had not de-

nounced the Castro regime was viewpoint discrimination).

Of course, the government is not required to fund arts programs. But if it chooses to do so, it must award the grants in a scrupulously viewpoint-neutral manner.

> It is well established that "even though a person has no 'right' to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."

*Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir.1995) (quoting *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)). In *Perry*, the Supreme Court held that a professor employed in a state college system could not be denied renewal of his contract because he had exercised his free speech rights in criticizing the college administration. 408 U.S. at 597, 92 S.Ct. 2694. *See also Thomas v. Review Board*, 450 U.S. 707, 717–18, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (state's denial of unemployment benefits to plaintiff because he left his job for religious reasons is an unconstitutional burden on the free exercise of religion); *Elrod v. Burns*, 427 U.S. 347, 360–61, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality) (dismissal from non-policymaking government job solely on basis of political affiliation is unconstitutional, although there is no right to public employment); *Shapiro v. Thompson*, 394 U.S. 618, 627–29, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (denial of welfare benefits unconstitutionally infringes right to travel although state need not provide benefits); *Hannegan v. Esquire*, 327 U.S. 146, 151, 157, 66 S.Ct.

456, 90 L.Ed. 586 (1946) (Postmaster General's denial of second-class postal privileges, "a form of subsidy," to a magazine based on its alleged immorality amounted to illegal censorship); *Gay & Lesbian Students Ass'n v. Gohn*, 850 F.2d 361, 362, 366 (8th Cir.1988) (while student organizations have no right to require a university to provide a funding mechanism for their activities, when the university chooses to fund student activities, it must do so "even-handedly, without discriminating among recipients on the basis of their ideology" and "in a viewpoint-neutral manner, absent other considerations"). "[T]axpayers will occasionally be obligated to support not only the thought of which they approve, but also the thought they hate. That is one of the fundamental premises of American law." *Id.*, at 362 (attributing the former statement to Justice Holmes).

Additionally, no one disputes that the government may establish criteria of artistic merit to allocate funding. The City cites *Advocates for the Arts v. Thomson*, 532 F.2d 792 (1st Cir.1976). *Thomson* involved an action that sought to enjoin the Governor of New Hampshire and the State Executive Council from revoking a previously approved state arts grant to a literary magazine that had published a poem they found offensive. *Id.* at 793. The First Circuit held that there had been no unconstitutional denial of the magazine's first amendment rights. *Id.* at 795. The court reasoned that because the very nature of the competitive grant application process ensures not all artistic expressions will be supported by the government, the "decision to withhold support is unavoidably based in some part on the 'subject matter' or 'content' of expression . . . ." *Id.* Thus, although subjective discretion is part of the grant review process, to be constitutional, as the court noted, the discretion must be based on the grant's artistic merit and not on political or ideological grounds.

*Id.* at 798 n. 8 ("We agree with the district court that distribution of arts grants on the basis of such extrinsic considerations as the applicants' political views, associations, or activities would violate the equal protection clause, if not the first amendment, by penalizing the exercise of those freedoms.").

## B. Causation standard.

Having noted that the City cannot discriminate against an arts organization based on its viewpoint, the Court must next decide whether the City actually did so. A yardstick is required with which to measure the City's actions. The Court believes the proper causation standard is set out in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

The *Mt. Healthy* test was developed to address the difficult problem of factually proving which of several factors motivated an employment decision. In *Mt. Healthy*, the school board declined to renew the contract of Doyle, an untenured teacher. In a statement, the board noted two reasons for its decision—Doyle had made obscene gestures at students in the lunchroom, and had made comments and provided information to a local radio station concerning new rules relating to teacher dress codes. The district court held that Doyle's call to the radio station was constitutionally protected and ordered his reinstatement. The Supreme Court held that this reasoning was inadequate. The Court stated that "[a] rule of causation which focuses solely on whether protected conduct played a part, 'substantial' or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing." *Id.* at 285, 97 S.Ct. 568. Such an

inflexible rule is unnecessary: "[t]he constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct." *Id.* at 285–86, 97 S.Ct. 568. Once Doyle had shown that his "protected conduct" played a "substantial" or "motivating" part in the board's decision not to rehire him, the burden shifted to the board to show by a preponderance of the evidence that it would have reached the same decision absent its consideration of Doyle's protected conduct. *Id.* at 287, 97 S.Ct. 568. Thus, the Court sought to strike a balance by protecting the constitutional rights of employees while also protecting the employer's right to make legitimate personnel decisions.

To reiterate, under the *Mt. Healthy* burden-shifting analysis, the plaintiff must first show by a preponderance of the evidence that his conduct was constitutionally protected and that his conduct was a substantial or motivating factor in the defendant's decision. *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568. To meet the second element of its proof and shift the burden to the defendant, a plaintiff must show that the defendant's decision was motivated in part by a constitutionally impermissible motive. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 270 n. 21, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). If the plaintiff makes this showing, the burden shifts to the defendant to prove by a preponderance of the evidence that it would have made the same decision in the absence of the protected conduct. *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568. Significantly, the defendant cannot satisfy its burden of proof by the mere assertion or demonstration that legitimate reasons existed for adverse action.

[P]roving that the same decision would have been justified ... is not the same as proving that the same decision would have been made.... An employer may not, in other words, prevail in a mixed-motives case by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision. Finally, an employer may not meet its burden in such a case by merely showing that at the time of the decision it was motivated only in part by a legitimate reason.... *The employer instead must show that its legitimate reason, standing alone, would have induced it to make the same decision.*

*Price Waterhouse v. Hopkins,* 490 U.S. 228, 252, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (citations omitted, emphasis added).

As far as the Court is aware, the *Mt. Healthy* burden-shifting analysis has not been applied to a pure claim of viewpoint discrimination. The *Mt. Healthy* formula has, however, been applied in numerous areas of the law in which intentions and motivations play a key role. As the Fifth Circuit noted in *Carter v. South Central Bell,* 912 F.2d 832, 843 (5th Cir.1990), "the Supreme Court has consistently shifted the burden of proof to the defendant in mixed-motive cases involving constitutional violations." The *Carter* court cited *Mt. Healthy* and *Hunter v. Underwood,* 471 U.S. 222, 228, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985), which applied the *Mt. Healthy* standard in an equal protection case that challenged a prisoner disenfranchisement statute in order to determine the motive behind the legislation. *See also NLRB v. Transportation Management Corp.,* 462 U.S. 393, 403, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) (applying the standard to mixed-motives cases in the unfair labor practice area); *Village of Arlington Heights,* 429 U.S. at 270 & n. 21, 97 S.Ct. 555 (applying the *Mt. Healthy* test to determine the intent of legislators in passing

on a zoning issue). In *Board of Educ. v. Pico*, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) the Court considered whether a school board had acted properly in removing books from the school library. The plurality opinion, authored by Justice Brennan, applied the *Mt. Healthy* standard. In doing so, Justice Brennan explained:

> Our Constitution does not permit the official suppression of ideas. Thus whether petitioners' removal of books from their school libraries denied respondents their First Amendment rights depends upon the motivation behind petitioners' actions. If petitioners *intended* by their removal decision to deny respondents access to ideas with which petitioners disagreed, and if this intent was the decisive factor in petitioners' decision, then petitioners have exercised their discretion in violation of the Constitution.

477 U.S. at 871, 106 S.Ct. 2734 (emphasis in original).[88]

The Fifth Circuit uniformly applies the *Mt. Healthy* test in retaliatory discharge cases. *See, e.g., Robinson v. Boyer*, 825 F.2d 64, 68 (5th Cir.1987); *Montgomery v. Trinity Indep. Sch. Dist.*, 809 F.2d 1058, 1061 (5th Cir.1987). In *North Mississippi Communications, Inc. v. Jones*, 874 F.2d 1064, 1068 (5th Cir.1989) ("*Jones II*"), the Fifth Circuit extended the *Mt. Healthy* test to a case involving retaliatory action for the exercise of First Amendment rights. There the owner of the *North Mississippi Times* newspaper brought an action against the DeSoto County Board of Supervisors contending that the county had withheld its advertising in the *Times* in retaliation for the newspaper's publication of editorials and news stories that were critical of the Board of Supervisors. In explaining the applicability of *Mt. Healthy*, the court stated:

> The facts here parallel those of a retaliatory discharge from employment case, in the sense that it is alleged that the defendants refused to employ the plaintiffs to provide services in retaliation for their having exercised their constitutional rights. It is also clearly a mixed motive case because the defendants, while acknowledging that the plaintiffs engaged in constitutionally protected conduct, assert that there were other legitimate grounds that motivated them to provide less business to the *Times* than they had previously.... [W]e consider this to be a mixed-motives case in which the *Mt. Healthy* analysis is appropriate.

*Id.*

There is no doubt that this is a mixed-motives case; council members listed numerous reasons for their withholding of funds from plaintiffs, some constitutionally acceptable, others not. Moreover, both parties recognize the burden-shifting test. Plaintiffs have argued for it all along. The City, while not mentioning *Mt. Healthy* by name, appears to have adopted it in its discussion of the evidence: "Esperanza cannot show that its gay and lesbian advocacy was a substantial [or] motivating factor in the City's decision,"[89] and "the evi-

---

**88.** By "decisive factor" the Court meant "a 'substantial factor' in the absence of which the opposite decision would have been reached." 457 U.S. at 871 n. 22, 102 S.Ct. 2799.

**89.** Defendants' brief at 11. The City deletes the bracketed "or," arguing that Esperanza's burden is to show viewpoint was a "substantial motivating factor." Clearly, the "or" belongs. Plaintiffs' initial burden is to show that their viewpoint was a substantial *or* motivating factor in the challenged decision. *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. 568; *Jones II*, 874 F.2d at 1067.

dence demonstrates that council would have made the same decision." [90]

The Court will apply *Mt. Healthy.*

Before proceeding to the evidence, however, it is important to note that this is not a facial challenge to the budget, which is facially benign. Thus, liability under § 1983 can attach to the passage of the budget "only if one peers behind the textual facade and concludes the legislative body acted out of a constitutionally impermissible motive." *Scott–Harris v. City of Fall River,* 134 F.3d 427, 436 (1st Cir. 1997), *rev'd on other grounds,* 523 U.S. 44, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998). Impermissible motive of council members may be proven by "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights,* 429 U.S. at 266, 97 S.Ct. 555. In *Village of Arlington Heights,* the Court suggested several possible evidentiary sources for such a determination including: (1) the impact of the action, *i.e.,* whether it bears more heavily on one group than another; (2) the historical background of the action, particularly if a series of actions have been taken for invidious purposes; (3) the specific sequence of events leading up to the challenged action; (4) any procedural departures from the normal procedural sequence; (5) any substantive departures from normal procedure, *i.e.,* whether factors normally considered important by the decisionmaker strongly favor a decision contrary to the one reached; and (6) the legislative history, especially where contemporary statements by members of the decisionmaking body exist. *Id.* at 266–68, 97 S.Ct. 555.

But this leaves unanswered the more difficult problem of proof—how many council members must be impelled by a constitutionally impermissible motive to hold the City liable under § 1983? The City argues that Esperanza must demonstrate that a *majority* of council members were improperly motivated by impermissible viewpoints.[91] The City reasons that a municipal ordinance can only become law through a majority vote of the council, therefore, the City has not engaged in unconstitutional viewpoint discrimination unless Esperanza can show that a majority of the council members were improperly motivated. The Fifth Circuit has taken no position on this question, the courts are split, and the Supreme Court, although presented with the opportunity to decide the issue in the *Scott–Harris* case, did not do so.

Basic municipal liability law teaches that a governmental entity can be found liable under § 1983 only if the entity itself causes the constitutional violation at issue; respondeat superior or vicarious liability are not bases for recovery. *Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In order to recover a judgment against a local governmental entity under § 1983, a plaintiff must establish that he sustained a deprivation of constitutional or other federally-protected rights as a result of some official policy, practice, or custom of that governmental entity. *Board of County Comm'rs of Bryan County, Okla. v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *Snyder v. Trepagnier,* 142 F.3d 791, 795 (5th Cir. 1998). In this case we are concerned with an official policy in the form of a budget ordinance passed by the city council. Such an ordinance cannot become law—that is, the official policy of the City—unless a majority of the council votes in favor. As

**90.** Defendants' brief at 16.

**91.** Defendants' brief at 11.

the Supreme Court explained in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986):

> The "official policy" requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible. *Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts "of the municipality"—that is, acts which the municipality has officially sanctioned or ordered.

*Id.* at 479–80, 106 S.Ct. 1292 (footnote omitted).

The courts take two approaches. Some have determined that a majority of the members of a legislative body must have been motivated by a constitutionally impermissible motive for liability to attach. In *Church v. City of Huntsville*, 30 F.3d 1332 (11th Cir.1994), several homeless individuals alleged that the city had adopted a policy of harassing them to drive them from the city. The plaintiffs based their § 1983 claim on statements of one member of the five-member city council. Two of the remaining four members' conduct had been clearly non-discriminatory while the other two had been silent. Because the plaintiffs could not show that a majority had acted with discriminatory intent, the city was not liable. *Id.* at 1343–44 & n. 5. *See also Holt Cargo Sys., Inc. v. Delaware River Port Auth.*, 20 F.Supp.2d 803 (E.D.Pa.1998) (to impute improper motives of two regulatory-board members to the board, plaintiffs must show that a majority of the board knew of the improper motives and ratified them), *aff'd* 165 F.3d 242 (3d Cir.1999).

The second approach, recognizing the difficulty of proving the discriminatory intent of a majority of a legislative body, holds that a city may be liable if discriminatory intent was a motivating factor for less than a majority. In *Scott–Harris*, the plaintiff, a city employee, claimed that her constitutional rights were violated when the city council passed a neutral ordinance that eliminated her position. The city council voted eight to two in favor of eliminating the position, and the defendants asserted they did so for budgetary concerns in order to erase a widening deficit. The jury found the city liable under § 1983. The city appealed, arguing that it could not be liable for the city council's decision to eliminate the position when only two of the ten city officials involved in the decision (nine-member city council plus the mayor) harbored a discriminatory motive for doing so. The court of appeals determined that evidence that a minority of the board members operated in bad faith was insufficient to hold the city liable, but assumed, without deciding, that

> in a sufficiently compelling case the requirement that the plaintiff prove bad motive on the part of a majority of the legislative body might be relaxed and a proxy accepted instead. Nevertheless, any such relaxation would be contingent on the plaintiff mustering evidence of both (a) bad motive on the part of at least a significant bloc of legislators, and (b) circumstances suggesting probable complicity of others.

*Scott–Harris*, 134 F.3d at 438.

Other courts have taken the same approach. In *United States v. City of Birmingham*, 538 F.Supp. 819 (E.D.Mich. 1982), *aff'd*, 727 F.2d 560 (6th Cir.1984), the plaintiff claimed that a seven-member municipal commission blocked the construction of a racially-integrated housing project for discriminatory reasons. The district court held the city liable for violations of the Fair Housing Act. It is sufficient, the court opined, if "racial consider-

ations were a motivating factor among a significant percentage of those who were responsible for the city's conduct." *Id.* at 828. Noting evidence that racial concerns motivated "at least two of the four members of the majority faction," the court declared that "[t]hat fact alone may be sufficient to attribute a racially discriminatory intent to the City." *Id.* at 829. In *Southern Worcester County Regional Voc. Sch. Dist. v. Labor Relations Comm'n,* 386 Mass. 414, 436 N.E.2d 380 (1982), the court upheld a lower court's finding that the plaintiffs had been discharged based on their union activity. The court declared that "it is not fatal to the [plaintiffs'] claims that only three of the seven members of the school committee made anti-union statements." *Id.* at 385. The court concluded that the statements of three members of the seven member board, coupled with evidence of bias on the part of the school superintendent (who had no vote), sufficed to support the finding of liability. *Id.* Similarly, in *Northeast Metropolitan Regional Vocational Sch. Dist. Sch. Comm. v. Massachusetts Comm'n Against Discrimination,* 31 Mass.App.Ct. 84, 90, 575 N.E.2d 77 (1991), a gender discrimination case involving a refusal to hire, while direct evidence of bias had been exhibited by only two of the twelve members of the school committee, the court upheld a finding of liability based on this evidence and on statements by three other committee members that the plaintiff had been a victim of discrimination or had been the best qualified candidate for the job. *Id.* at 81–82.

The dilemma facing the courts considering this question is succinctly expressed:

> On the one hand, because a municipal ordinance can become law only by a majority vote of the city council, there is a certain incongruity in allowing fewer than a majority of the council members to subject the city to liability under section 1983. On the other hand, because discriminatory animus is insidious, and a clever pretext can be hard to unmask, the law sometimes constructs procedural devices to ease a victim's burden of proof.

*Scott–Harris,* 134 F.3d at 438. The argument against the *Scott–Harris* approach is that holding a municipality liable for the discriminatory motivations of a minority of its council does not meet the "official policy" requirement articulated by the Supreme Court in *Monell.* On the other hand, few legislators will admit to unconstitutional motivations behind their vote. It thus becomes an exceedingly difficult and perilous enterprise to establish the intent of a lone legislator. And when the legislative body consists of numerous legislators, each with his or her own myriad and conflicting motivations, the plaintiff's burden is multiplied, if not impossible. *See Edwards v. Aguillard,* 482 U.S. 578, 636–39, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (Scalia, J., dissenting). It is precisely because the plaintiff's burden of proof is so onerous that *Scott–Harris* left open the possibility of a "relaxed" approach, and *City of Birmingham,* and the Massachusetts decisions have applied it.

The Court believes the *Scott–Harris* approach is preferable because it strikes the proper balance between difficulty of proving a legislative body's motivation and the fact that a municipal ordinance can only become law by majority vote of council. *See Scully v. Borough of Hawthorne,* 58 F.Supp.2d 435, 455–56 (D.N.J.1999). In the present case, however, as will be explained below in discussing the evidence of viewpoint discrimination, the Court finds that plaintiffs' constitutionally protected conduct was a substantial or motivating factor in the decision of a majority of council members. Thus resort to *Scott–Harris* will only become necessary if the

Court is mistaken in its tally of the members' motivations.

## C. Applying *Mt. Healthy* with the *Arlington Heights* factors.

### 1. Protected conduct.

No one argues that art is not protected by the First Amendment. *See, e.g., Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 569, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) (painting, music, and poetry are "unquestionably shielded"); *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) ("[e]ntertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee"); *Kaplan v. California*, 413 U.S. 115, 119–20, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973) ("pictures, films, paintings, drawings, and engravings ... have First Amendment protection").

### 2. Substantial or motivating factor.

The substantial or motivating factor inquiry, as described in *Price Waterhouse*, 490 U.S. at 250, 109 S.Ct. 1775, is whether, if the employer had been asked at the time of its decision what its reasons were, and gave a truthful response, one of those reasons would be the impermissible motive. This is enough to shift the burden of proof to the defendant. *Jones II*, 874 F.2d at 1068 n. 1. *Accord Pico*, 457 U.S. 853 at 871 n. 22, 102 S.Ct. 2799 (plurality) (The im-

proper motive must have been the decisive factor. "By 'decisive factor' we mean a 'substantial factor' in the absence of which the opposite decision would have been reached.").

#### a. Proper motivations.

Before reviewing what factors specifically motivated the council members, we should consider which motivations are constitutionally acceptable and which are not. The City advances several possible motivations, arguing that all are constitutionally permissible motivations.

i. *Back to basics, and no public funding for any art.* Many members felt "back to basics" projects, such as education, roads, drainage, and police and fire protection, should receive priority over funding for the arts. At least one or two members expressed a preference to eliminate public funding for all arts organizations. Both motivations are constitutionally permissible.

ii. *Constituents' belief that City should not fund groups "advocating a gay and lesbian lifestyle."* The City admits that "some" opponents of Esperanza's funding believe that homosexuality is immoral, and it points out that this belief is "neither [a] novel nor new" viewpoint, as if homophobia's "ancient roots" makes discrimination against homosexuals or against those that promote the artistic expressions of lesbians and gay men constitutionally acceptable.[92] The City goes further, however, and argues that even if opposition to the

---

**92.** Defendants' brief at 7. Racial discrimination also has "ancient roots," but the antiquity of stupid beliefs does not make them constitutionally acceptable. *See Palmore v. Sidoti*, 466 U.S. 429, 433, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984) (societal racism not an acceptable justification for discrimination); *Buchanan v. Warley*, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917) (racial segregation cannot be sustained upon the grounds of societal acceptance). Of course, unlike race, sexual orientation has not been afforded strict-scrutiny protection. But this case does not involve sexual orientation; rather, it concerns whether advocacy of any unpopular viewpoint may serve as the basis for discrimination in the allocation of government subsidies.

advocacy of gay and lesbian lifestyles or artistic expression "had ... been a substantial [or] motivating factor, the City's decision was not constitutionally infirm." [93] Why? Because the City can refuse to pay for Esperanza's advocacy of gay and lesbian lifestyles out of discretionary arts funds. The City relies on *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), which held that the belief of the majority of the Georgia electorate that homosexual sodomy is immoral and unacceptable provided a rational basis for criminalizing that behavior. *Id.* at 196, 106 S.Ct. 2841. The City confuses the apparent lack of constitutional protection for homosexual sodomy with the unquestionable First Amendment protection afforded the expression of viewpoints, both popular and unpopular. *See id.* at 195, 106 S.Ct. 2841 (distinguishing *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) on the ground that *Stanley* was a First Amendment case). At issue here is not homosexual activity, but the fundamental right of a citizen of this country to advocate his or her beliefs, even if those beliefs are detested by a majority of one's fellow citizens. The Supreme Court has made crystal clear that viewpoint discrimination in subsidy programs is not permissible. *Finley*, 524 U.S. at 587, 118 S.Ct. 2168 ("even in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas ...'" (quoting *Regan v. Taxation with Representation*, 461 U.S. 540, 550, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983))); *Rosenberger*, 515 U.S. at 828–29, 115 S.Ct. 2510 ("[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction").

The City argues that its council has the right and the obligation to listen to constituent opinion in making arts funding decisions.[94] Of course this is true. And if its constituents decided that they wanted to fund, say, performing arts at the expense of visual arts, no constitutional prohibition would forbid the council from enacting their will. Likewise, if its constituents preferred to fund arts projects that would attract tourist dollars instead of projects geared only to local participation, that too is acceptable. But the voters *cannot* require the council to deny funding to an arts group merely because that group promotes a social or political viewpoint those voters find objectionable. The City cites *Finley* in support of its argument, but its reliance on that case is mistaken. The City correctly quotes *Finley* as noting that the government "may allocate competitive funding based on criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." 524 U.S. at 587–88, 118 S.Ct. 2168. But the City ignores the rest of the Court's statement: "[s]o long as legislation does not infringe on *other constitutionally protected rights,* [the government] has wide latitude to set spending priorities." *Id.* at 588, 118 S.Ct. 2168 (emphasis added). In other words, unconstitutional criteria such as viewpoint discrimination cannot be among the criteria used to allocate funding. This is made plain in *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991):

> The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In

---

**93.** Defendants' brief at 6–7.

**94.** Defendants' brief at 6.

doing so, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other.

*Id.* at 193, 111 S.Ct. 1759. In other words, the council may choose among arts groups seeking to put on projects that will attract tourists to San Antonio. It may choose to fund one group but not another, because it feels the chosen group has a strategy more likely to succeed in drawing visitors to San Antonio. The council may even select between groups competing for funds to sponsor, say, a film festival because it feels one group has chosen better quality films, or because one group has a stellar history of promoting its projects within the community and the other does not, or because the chosen group is organizationally more stable and is thus able to provide accountability for the public's funds, or for any number of similar reasons. But the council may *not* choose to withhold funds from a group merely because the council—or its constituents—disagree with the message the group espouses.

This idea is neither novel nor new. Rather, it is fundamental. *See Boos,* 485 U.S. at 322, 108 S.Ct. 1157 (noting the Court's refusal to punish speech because of its adverse emotional impact on the audience); *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 448, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (community bias against mentally retarded not an acceptable justification for discrimination); *Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 510, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (school district could not prohibit students from wearing black armbands in protest of the war in Vietnam because school officials feared disruption or disturbance); *Epperson v. Arkansas,* 393 U.S. 97, 107–08, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (state could not prohibit teaching Darwin's theory of evolution in the public schools because teaching the

theory offended the dominant religious beliefs of the community); *Gohn,* 850 F.2d at 367 (political pressure from state legislators not to fund the Gay and Lesbian Students Association or to allow dissemination of opinions tolerant towards homosexuals were not proper justifications for denying funding to the student group); *Brown v. Board of Regents,* 640 F.Supp. 674, 679 (D.Neb.1986) (cancelling film "Hail Mary" because of complaints from religious community and fear of controversy precluded by First Amendment); *Wilson v. Chancellor,* 418 F.Supp. 1358, 1364 (D.Or.1976) (banning communist speaker "in order to placate angry residents and taxpayers" is forbidden by First Amendment; "neither fear of voter reaction nor personal disagreement with views to be expressed justifies a suppression of free expression").

iii. *Esperanza is "too political."* The City argues that it is acceptable to deny funding to Esperanza because Esperanza is a "political organization" or is "too political." The theory is that arts funds should be reserved for arts groups, not political groups. We should be most vigilant whenever a government official undertakes to restrict speech because it is too "political." Labeling expression as "political" can often serve as proxy for suppression of unfavored ideas.

Far too frequently the mantle of nonpartisanship is thrown over the shoulders of those who have been successful in obtaining political and economic power in our society, while the pejorative of "political" is reserved for those who have been less successful in those same endeavors.... What is "political" and what is "nonpartisan" must of necessity—as must beauty—lie in the eyes of the beholder. For that very reason, the Constitution will not allow such determi-

nations to be made by government officials.

*Lawrence Univ. Bicentennial Comm'n v. City of Appleton, Wis.,* 409 F.Supp. 1319, 1325 (E.D.Wis.1976). As has often been noted, political speech lies at the core of the First Amendment where its protections are at their zenith. *See, e.g., Meyer v. Grant,* 486 U.S. 414, 425, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988); *Boos,* 485 U.S. at 318, 108 S.Ct. 1157; *accord Nixon v. Shrink Missouri Government PAC,* 528 U.S. 377, 410–11, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) (Thomas, J., dissenting) ("[p]olitical speech is the primary object of First Amendment protection"); *Carey v. Brown,* 447 U.S. 455, 467, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (expression on public issues "has always rested on the highest rung of the hierarchy of First Amendment values"); *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) ("speech concerning public affairs is more than self-expression; it is the essence of self-government").

> [T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment, which was designed to secure the widest possible dissemination of information from diverse and antagonistic sources, and to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.

*Buckley v. Valeo,* 424 U.S. 1, 48–49, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (quotation marks omitted).

The constitution requires viewpoint neutrality in order to prevent government suppression of controversial or otherwise disfavored ideas because the categorization of speech as "political" or "controversial" is usually determined according to the values and attitudes of the decisionmaker. *See*

*U.S. Southwest Africa/Namibia Trade & Cultural Council v. United States,* 708 F.2d 760, 769 (D.C.Cir.1983) (excluding political speech operates to screen out controversial but not innocuous messages); *Bullfrog Films, Inc. v. Wick,* 847 F.2d 502, 511 (9th Cir.1988) (proscriptions on films that attempt generally to influence opinion or to espouse or criticize a cause or policy are unconstitutional because they limit expressions of opinion on issues of public controversy); *AIDS Action Comm. v. Massachusetts Bay Transp. Auth.,* 42 F.3d 1, 12 (1994) (banning condom ads oriented toward gay men that used sexual innuendo and double entendre but allowing movie ads that were "more overtly sexual and more blatantly exploitative" amounts to censorship of controversial but not conventional sexual ideas); *Air Line Pilots Ass'n v. Department of Aviation,* 45 F.3d 1144, 1159 (7th Cir.1995) (noting that views labeled "political" are usually those that are considered controversial or challenge the status quo).

Clearly, labeling expression as "too political" (or "too controversial" or "too offensive") cannot be used to justify—or disguise—viewpoint suppression. Rather, discriminating against someone on the basis that they are "too political" is discrimination *precisely because* that person has chosen to express a political viewpoint.

Moreover, the "political" justification offered in support of the City's denial of funds does not wash when the evidence is examined. The political nature of Esperanza's programming was never considered previously when, for years, Esperanza had been favorably evaluated by peer-review panels, CAB, and DACA staff. Nor is absence of politics one of the criteria adopted by the city council in the DACA Strategic Plan for judging eligibility for funding. In fact, one of the goals of the Plan is that arts funding support programs

that address social issues such as "AIDS, youth issues such as gangs and drugs, education, and the homeless population."[95] The City does not require that applicants for arts funding focus exclusively on arts activities, and the City may provide arts funding for programs addressing social and political concerns.[96] In addition, if the City's policy was strictly to deny arts funding to all "non-arts" groups, it failed miserably in applying it. As we have already seen, the City funded the arts programs of various groups that had political and social objectives.[97] Moreover, the City funded the Alamo Men's Chorale, a gay men's singing group, precisely because it was not political or controversial.[98] The City's actions would lead one to suspect that it chose to fund only those groups whose politics and social views it found unobjectionable, and was willing to fund arts groups that were silent as to their gay or lesbian lifestyle, while it refused to fund groups that openly acknowledged or promoted that disfavored lifestyle. The City may not punish those who speak out on political and social issues. The City may not use the appellations "gay" or "political" as a pretext for viewpoint discrimination. *See, e.g., Rosenberger,* 515 U.S. at 831, 115 S.Ct. 2510 (university rule excluding religious publications from eligibility for student-activity funds was viewpoint-based because it permitted funding of publica-

tions that approached religion from secular perspectives, but "select[ed] for disfavored treatment those student journalistic efforts with religious editorial viewpoints.").

iv. *"Aggressive" advocacy.* The City also justifies its decision on the ground that many on the council objected to the "aggressive" advocacy of plaintiffs and their supporters. There has been neither claim nor evidence that Esperanza's supporters engaged in illegal or violent conduct. Rather, council members described their advocacy as "a little more aggressive in their approach" than other groups;[99] as "very overzealous" and "rude";[100] as making "campaign threat[s]" against council members, and as demonstrating a "lack of respect to the elected officials."[101] Council Member Webster's testimony demonstrates clearly how vague the objections to the Esperanza's advocacy really were: "I guess people call it warm fuzzies, and I can't say that some of the presentations by [Esperanza] itself made me want to go out and be an advocate for them."[102]

■ The city council's penalization of Esperanza for this advocacy will not survive First Amendment scrutiny. There is no indication in the record that the speech used by Esperanza's partisans was anything more than assertive, passionate advocacy. Such advocacy is protected by the

---

95. PX 104 at 3, Undisputed fact 8.

96. Undisputed facts 15 & 16.

97. See page 442–43 supra. Moreover, as Esperanza's expert, Dr. Tomas Ybarra Frausto, explained, it is impossible to divorce art from political and social issues. (TR 482–87, 489.)

98. As Council Member Tim Bannwolf put it, "they just get up and sing, they don't advocate a particular lifestyle." (TR 497–98.)

99. TR 495, Bannwolf.

100. TR 355, 356, Guerrero. Council Member Guerrero acknowledged the Catch–22 faced by the plaintiffs: although on the one hand she criticized their advocacy as overzealous—claiming that they did not attempt to properly "sell" themselves to the council members, TR 355—on the other hand, she readily admitted that council members' preconceived perception of Esperanza as a "political" organization "impacted how they were able to sell themselves to the Council." TR 340.

101. TR 458–59, 462, Garza.

102. TR 307–08.

First Amendment. Speech that is neither obscene nor libelous is protected unless the words, by their very utterance, inflict injury or tend to evoke immediate violence or other breach of the peace. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). Generally, "in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." *Boos*, 485 U.S. at 322, 108 S.Ct. 1157. "Urgent, important, and effective speech can be no less protected than impotent speech, lest the right to speak be relegated to those instances when it is least needed." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). "[T]he First Amendment does not permit the government to punish speech merely because the speech is forceful or aggressive. What is offensive to some is passionate to others." *United States v. Dinwiddie*, 76 F.3d 913, 925 (8th Cir.1996). As the Supreme Court has explained:

> a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea.... There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups.

*Terminiello v. Chicago*, 337 U.S. 1, 4–5, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) (citations omitted).

Furthermore, as is clear from the evidence, Esperanza's opponents were just as vocal and aggressive as its supporters, if not more so, illustrating that the council cited Esperanza's advocacy as a rationalization for viewpoint discrimination.

### b. Legislative history—motivations of the council members.

Certainly a majority of council members expressed constitutionally-acceptable motivations for their decision to deny plaintiffs funding. It is apparent from the evidence, however, that a clear majority of the council [103] was motivated, at least in part, by plaintiffs' views on gay and lesbian, political, and social issues, by their constituents' objections to funding "Out at the Movies," and by their dissatisfaction with Esperanza's supporters' "aggressive" advocacy style.

The Mayor believed Esperanza's programming was "too social and political inasmuch as they used the political process to advance their social causes." [104] One of those social causes that he was aware of was gay and lesbian concerns, which was "the main one, certainly, that they have come to be known for." [105] The Mayor believed an organization that included programming addressing social issues should not receive arts funding.[106] Members of *MujerARTEs* testified that the Mayor told them during a conversation at Lion's Field the day before the budget meeting that Esperanza would be de-funded because of its lesbian and gay programming and because it was an "in-your-face organiza-

---

**103.** The San Antonio City Council consists of ten members plus the mayor. Thus, six votes constitute a majority.

**104.** TR 403.

**105.** TR 403–04.

**106.** TR 405, 427.

tion."[107] During another conversation at Lion's Field that same day, members of the staff of Jump Start Performance Company testified that the Mayor told them that Esperanza was being targeted because of the type of programming they did.[108] In comparing Esperanza with the Alamo City Men's Chorale, the Mayor said the Chorale's programming was not "in-your-face" like Esperanza's.[109]

A second council member acknowledged that his constituents had concerns because Esperanza "advocated for a gay and lesbian lifestyle" through their programming, which he assumed was arts programming.[110] When asked why he voted to eliminate funding for Esperanza instead of an across-the-board cut to all arts applicants, he testified that he was accommodating these constituent concerns, and that he was "turned off" by Esperanza's aggressive tactics.[111] This council member told Graciela Sánchez, Esperanza's executive director, that it was important for him not to support the lesbian and gay film festival because he is "morally opposed" to it.[112] The member stated he did not support cutting funding for the gay's mens' singing group, the Alamo Men's Chorale, because "they just get up and sing, they don't advocate a particular lifestyle."[113]

A third council member appeared on an Adam McManus show in which the specific discussion was opposition to funding Esperanza because of its gay and lesbian programming.[114] He explained that, with regard to Esperanza, he personally agreed with his conservative constituents that the Esperanza "is not a group that my constituency is telling me they want me to support"; and that "[w]e defunded them . . . and what we did we think was a reflection of the community of San Antonio."[115] The council member also complained of the aggressive tactics of Esperanza's supporters.[116] Another council member indicated that this council member had concerns about Esperanza's gay and lesbian programming and its politics.[117]

A fourth council member testified that "some of [Esperanza's] art was political. Which is, you know, just the nature of what art is."[118] She believed, however, that its arts programming—which she characterized as trying to promote tolerance for people who are different—was too political and that Esperanza "overstepped its boundaries" in this way.[119] She also confirmed that other council members thought that Esperanza's arts programming was "too political."[120] This council member also complained that Esperanza's advocates were "very overzealous" and "rude," which contributed to the impression among council members that Esperanza was not an organization that was trying to court support, but instead was

**107.** TR 198–99.

**108.** TR 206.

**109.** TR 207. The Mayor did not recall what he had said to these witnesses at Lion's Field. TR 409.

**110.** TR 497, 512.

**111.** TR 513.

**112.** TR 103.

**113.** TR 497–98.

**114.** PX 91.

**115.** PX 91.

**116.** TR 307–08, 309.

**117.** TR 254.

**118.** TR 357–58.

**119.** TR 341.

**120.** TR 341–42.

trying to force an issue.[121]

A fifth council member was offended by Esperanza's aggressive and intimidating tactics, and its sense of entitlement to city funding.[122] He also admitted that the public debate against Esperanza—which largely opposed its favorable portrayal of gays and lesbians—was a motivating factor, and this debate influenced the decision by making it more difficult to fund Esperanza.[123]

A sixth council member stated on McManus's radio program that the council's decision to defund Esperanza "was a decision based on the desires of the community." [124] He also admitted that most of the constituent feedback he received opposed the Esperanza because of the gay and lesbian content of its programming.[125]

A seventh council member believed that Esperanza was a political, rather than an arts organization.[126] During a meeting in the morning of September 11, 1997, he said he would not vote for funding for Esperanza because it was too political.[127]

Thus, seven council members, a clear majority, were motivated at least in part to defund Esperanza in response to its constitutionally-protected conduct. This is enough to shift the burden to the City to show that it would have made the same decision absent plaintiffs' viewpoints.[128]

*Scott–Harris* analysis. Even if a majority of council members had not expressed unconstitutional motivations, under the reasoning of *Scott–Harris*, 134 F.3d at 438, the evidence shows both an improper motive on the part of a significant bloc of council members, and circumstances suggesting probable complicity of others. Two council members, Roger Flores and Debra Guerrero, confirmed that constituent opposition to funding of Esperanza because of its gay and lesbian programming influenced the decisions of some council members.[129] Flores and Guerrero, based on their conversations with other council members, also felt members were concerned about the political nature of Esperanza's programming.[130] In addition, council member Rick Vasquez indicated that he went along with the other members on Esperanza because the budget took care of his priorities, as did council member Raul Prado.[131]

### c. Other *Arlington Heights* factors.

Beyond the statements and testimony of the council members enumerated above, other *Arlington Heights* factors shed light on whether a discriminatory purpose was a motivating factor in the decision to defund the plaintiffs. *See Arlington Heights*, 429 U.S. at 266–68, 97 S.Ct. 555.

i. *Impact of the decision.* The defunding decision targeted only the plaintiffs.

---

121. TR 354–57.

122. TR 460, 461–62; PX 39.

123. TR 448–50.

124. TR 267–68.

125. TR 264–65, 265–66.

126. TR 375.

127. TR 224.

128. To meet the second element of its proof and shift the burden to the defendant, a plaintiff must show that the defendant's decision was motivated in part by a constitutionally impermissible motive. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 270 n. 21, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

129. TR 231–32, 344.

130. TR 231–33, 341–43.

131. TR 380, 476.

All other arts groups received a uniform across-the-board cut, but, unlike the plaintiffs', their funding was not eliminated entirely. Thus where a decision targets only one or a few organizations, discriminatory intent is more likely. *See, e.g., Arkansas Writers' Project v. Ragland,* 481 U.S. 221, 229, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987) (evidence that denial of tax benefit applied to only a "few" general interest magazines supports finding of discriminatory intent); *Minneapolis Star and Tribune v. Minnesota Commissioner of Revenue,* 460 U.S. 575, 591–592, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983) (evidence that tax on newspaper ink and paper was written so that it applied only to a few newspapers and exempted all the rest provided proof of discriminatory intent).

ii. *Historical background of the decision and sequence of events leading to the decision.* Council was deluged with a campaign of public opposition to funding any groups promoting the "homosexual agenda." The vast majority of this campaign was directed against Esperanza and its sponsorship of the "Out at the Movies" film festival.

iii. *Procedural and substantive departures from normal procedure.* As we have seen, plaintiffs met the criteria established by the City to become eligible for funding. Yet many of the reasons provided by council members—plaintiffs' gay and lesbian programming, their constituents' objections to that programming, their political and social agenda, their aggressive lobbying tactics—have nothing to do with City-mandated criteria. While other groups had gay members, had produced programming by or about gays and lesbians, and had listed political or social aims in their mission statements, these "criteria" did not impede their funding. Substantive departures from existing policy can cast a light on discriminatory purpose, "particu-

larly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Arlington Heights,* 429 U.S. at 267, 97 S.Ct. 555. Here, had the regular procedural and substantive procedures been followed, at worst, plaintiffs would have suffered no more than the across-the-board funding cut applied to all other arts groups who were approved for funding by DACA and the CAB. Yet the council applied criteria to plaintiffs that it applied to no other arts groups to deny funding to plaintiffs.

### 3. Same decision despite protected conduct.

Plaintiffs have carried their burden under *Mt. Healthy* and have shown by a preponderance of the evidence that their conduct was constitutionally protected and that this conduct was a substantial or motivating factor in the City's defunding decision. Thus, the burden shifts to the City to prove by a preponderance of the evidence that it would have made the same decision in the absence of the protected conduct. The City has failed to meet this burden.

The City has identified two reasons for the decision to defund the plaintiffs in 1997 and again in 1998: the council's desire to implement a "back-to-basics" budget and the council's desire to reach consensus on the annual budgets. Yet the evidence in this case cannot support a conclusion that the council would have defunded the plaintiffs in the absence of Esperanza's expressions of viewpoint. Indeed, the overwhelming evidence suggests that absent the constitutionally-protected conduct, most city council members would never have heard of Esperanza.

Moreover, the evidence casts strong doubts on the significance of the "back to basics" rationale. An initial draft of May-

or Peak's consensus memorandum, circulated to council members the day before, proposes that funding for the plaintiffs be eliminated and reallocated as arts funding for the Witte Museum and the Guadalupe Center rather than to funding for basic services.[132] Council Member Guerrero testified that she and Council Member Bannwolf knew about the proposal to reallocate money from Esperanza to the Witte and the Guadalupe.[133] No council member, however, even those who testified that they supported defunding Esperanza because of their "back to basics" priorities, knew where the money originally allocated to Esperanza was reallocated.

The "consensus" rationale is equally inadequate to prove that the defunding decision would have been made in the absence of the constitutionally-protected conduct. Indeed, it merely suggests that some council members sought the defunding as one element of the compromise proposal. The evidence indicates that the City budget office prepared various alternatives, which included an across-the-board cut for all arts agencies as had always been the practice in the past when the arts budget had been reduced. The city council, or some members of the council, chose the alternative that included the 100 percent cut for Esperanza. The evidence establishes that this choice—the decision to defund the plaintiffs—was made because of the plaintiffs' constitutionally-protected expressions of viewpoint.[134]

### 4. Not narrowly tailored to achieve a compelling state interest.

Because the council's action impinges upon fundamental rights protected by the Constitution—plaintiffs' First Amendment rights—it may be justified only if the City can show that its defunding decisions were necessary to serve a compelling government interest and if the decisions were narrowly drawn to achieve that end. *R.A.V.*, 505 U.S. at 395, 112 S.Ct. 2538; *Boos*, 485 U.S. at 321, 108 S.Ct. 1157; *Gohn*, 850 F.2d at 366. The Court finds that the record is devoid of evidence sufficient to establish a compelling government interest that is served by the decisions to defund the plaintiffs. Defendants have not suggested such an interest, and the Court cannot imagine one.

█ In conclusion, the City violated the First Amendment by defunding plaintiffs based on their viewpoints.

---

132. PX 113.

133. TR 347–48.

134. The present case is remarkably similar to *Gay & Lesbian Students Ass'n v. Gohn*, 850 F.2d 361 (8th Cir.1988), in which the University of Arkansas refused to allow the Gay and Lesbian Student Association (GLSA) to receive monies from the student activities fund. The court stated that while the GLSA had no right to funding, any funds made available by the university must be distributed in a viewpoint-neutral manner. *Id.* at 366. The court found that the evidence supported a finding of viewpoint discrimination.

> The GLSA met all objective criteria for funding and received the [Student Senate's] Finance Committee's recommendation, yet was denied funds twice. The one time the GLSA received funds, an unusual procedure was followed in presenting requests before the [Student] Senate. And, immediately after the granting of funds, the Senate voted never to fund the GLSA again. All other qualified groups received money. There was no shortage of resources, since unqualified organizations were given funds, and money was left over at the end of the appropriations period. Some student senators freely admitted they voted against the group because of its views. University officials were feeling pressure from state legislators not to fund the GLSA or to allow in any way the dissemination of opinions tolerant towards homosexuals. It is apparent that the GLSA was denied [university] funds because of the views it espoused.
>
> *Id.*

## III. Equal protection.

 When a state, or its political subdivision, distinguishes between two similarly-situated groups, the distinctions it makes are subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment. The Equal Protection Clause commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. AMEND XIV, § 1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne,* 473 U.S. at 440–41, 105 S.Ct. 3249 (citations omitted); *see also Rolf v. City of San Antonio,* 77 F.3d 823, 828 (5th Cir. 1996). The government may not distinguish between individuals solely on differences that are irrelevant to a legitimate governmental objective. *Reed v. Reed,* 404 U.S. 71, 75–76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

 If, as in this case, the legislative enactment does not burden a fundamental right or target a suspect class, the legislative classification will be upheld so long as it bears a rational relation to some legitimate end. *Romer v. Evans,* 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). Thus, in order to establish an equal protection claim, plaintiffs must prove (1) that the City created two or more classifications of similarly-situated groups that were treated differently, and (2) that the classification had no rational relation to any legitimate governmental objective. *Stefanoff v. Hays County,* 154 F.3d 523, 526 (5th Cir.1998).

## A. Different treatment of similarly-situated groups.

 There should be no debate that plaintiffs satisfied the first prong of their burden—that they were singled out for different treatment from among the groups approved for arts funding. The City argues, however, that "other gay and lesbian arts organizations were funded in the budget years in question." [135] Since the City does not elaborate on this argument, it is difficult to determine what it means by "gay and lesbian arts organizations." Apparently, it refers to organizations either composed of gays or lesbians (*e.g.,* Alamo Men's Chorale), or organizations that present art with gay and lesbian themes or by gay and lesbian artists (*e.g.,* Jump Start Performance Co., the Guadalupe Center).[136] These groups received funding in the budgets. However, that is not the critical distinction. Esperanza does not describe itself as a "gay and lesbian arts organization." Clearly, its mission statement and the types of programs it presents go far beyond the presumed narrow focus of a so-called "gay and lesbian arts organization." The same is obviously true of Jump Start and the Guadalupe Center. Moreover, the Men's Chorale, like defendant Media Project, explicitly invite participation by non-gay and lesbian people. Thus, the proper analysis is not to create an artificial distinction between "gay and lesbian arts organizations" and "non-gay and lesbian arts organizations," but rather, to look at all similarly-situated *arts* organizations, *i.e.,* those organizations that met the City's funding criteria and were approved for funding by

---

**135.** Defendants' brief at 19.

**136.** The only reference to these other groups in the City's brief is to PX 82, which is correspondence from Council Member Garza's file that indicates the Guadalupe, the Alamo City Men's Chorale, and Jump Start also received

opposition to funding during the budget process. Defendant's brief at 15. The Court has found no other possible reference to "gay and lesbian arts organizations" that received funding.

DACA and the CAB, and examine whether any among them were singled out for different treatment.

So viewed, it is clear that the City treated plaintiffs differently from other similarly-situated arts organizations. The city budget for fiscal year 1997–98, as adopted, includes a line explicitly eliminating all funding for Esperanza.[137] It is undisputed that plaintiffs were among numerous outside agencies recommended for arts funding grants in the proposed fiscal year 1997–98 city budget.[138] It is undisputed that of the arts organizations recommended for funding in the proposed annual budget for fiscal year 1997–98, plaintiffs were the only organizations whose funding was completely eliminated in the adopted budget.[139] Moreover, it is undisputed that in prior budget years, the city council had altered DACA funding recommendations for arts organization grants solely by across-the-board changes; the city council had never before eliminated all funding for a particular agency that had been recommended by DACA.[140] And it is undisputed that neither DACA nor the city council had ever denied funding for a properly and timely-submitted second-year application for a two-year operational grant, other than the 1997 defunding of Esperanza.[141]

## B. Rational relation to legitimate purpose.

 The second prong of the equal-protection analysis requires plaintiffs to show that the City's classification had no rational relation to any legitimate governmental objective. "In general, the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Nordlinger v. Hahn*, 505 U.S. 1, 11, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) (citations omitted). The third criteria, requiring a rational relationship between the classification and its goal, does not provide "a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Nor does it authorize "the judiciary [to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976). Non-suspect classifications are "accorded a strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 318–19, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (citing *Beach Communications*, 508 U.S. at 307–08, 113 S.Ct. 2096). Such classifications "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Communications*, 508 U.S. at 313, 113 S.Ct. 2096. The legislative body has no obligation to produce evidence to sustain the rationality of a statutory classification. "[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Id.*, at 315, 113 S.Ct. 2096. Legis-

---

137. PX 36.

138. PX 30; Undisputed fact 31.

139. PX 30, 36; Undisputed fact 32.

140. TR 41; Undisputed fact 33.

141. TR 17; Undisputed fact 23.

lation is presumed to be valid, and the one attacking the legislation has the burden to negative every conceivable basis that might support it, whether or not the basis has a foundation in the record. *Heller,* 509 U.S. at 320, 113 S.Ct. 2637. Under rational-basis review, courts are compelled to accept a legislature's generalizations even when there is an imperfect fit between means and ends. *Id.* In the areas of social or economic legislation, the Equal Protection Clause allows governing bodies wide latitude, based on the presumption that even improvident decisions will eventually be rectified by the democratic processes. *City of Cleburne,* 473 U.S. at 440, 105 S.Ct. 3249. "A statutory classification fails rational basis review only when it 'rests on grounds wholly irrelevant to the achievement of the State's objective.'" *Heller,* 509 U.S. at 324, 113 S.Ct. 2637 (quoting *Holt Civic Club v. Tuscaloosa,* 439 U.S. 60, 71, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978)).

As can readily be seen, this is an extremely deferential standard. There are legislative purposes, however, that do not satisfy rational basis analysis. "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Romer,* 517 U.S. at 634, 116 S.Ct. 1620 (quoting *U.S. Department of Agriculture v. Moreno,* 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973)). Nor may the electorate, whether by vote or otherwise, order the government to take action that violates the Equal Protection Clause, and the government may not avoid the Clause by deferring to the wishes or objections of some fraction of the electorate. *City of Cleburne,* 473 U.S. at 448, 105 S.Ct. 3249. Thus, in *City of Cleburne,* the Court scrutinized the city's proffered reasons for denying a zoning permit to a home for the mentally disabled: the city sought to control traffic congestion and to avoid risks associated with living in a 500-year flood plain. Those purposes were legitimate, yet there was no rational "fit" between the challenged decision and those purposes since the city had allowed boarding houses, convalescent hospitals, and fraternities in the same area and could not explain how homes for the mentally disabled posed unique risks. *City of Cleburne,* 473 U.S. at 449, 105 S.Ct. 3249. Similarly, in *Moreno,* the Court examined potential governmental purposes for its related-households rule, and observed that a distinction between households in which all members were related and households in which they were not was "irrelevant" to promoting the government's purposes for the food stamp law: nutrition and farming. *Moreno,* 413 U.S. at 533, 93 S.Ct. 2821. Under the rational basis test, the question is whether there is a rational explanation for why the government treated one group differently and drew the line where it did. *See Zeigler v. Jackson,* 638 F.2d 776, 779 (5th Cir.1981) (government classifications "must be reasonable, not arbitrary, and must rest on grounds having a fair and substantial relation to the object of the legislation").

The City has identified four reasons for treating plaintiffs differently as rational bases for its action.[142] The City's primary

---

**142.** Defendant's brief at 19. The Court realizes that it is plaintiffs' "burden to negative every conceivable basis that might support it, whether or not the basis has a foundation in the record." *Heller,* 509 U.S. at 320, 113 S.Ct. 2637. Plaintiffs have done so by challenging in its brief the City's asserted bases along with a fifth basis—the perception by several council members that Esperanza was "offensive" or "aggressive" in its presentations to the council and in conversations with

argument is that "strong opposition against homosexuality as immoral and unacceptable provides a rational basis for the City's action." [143] Once again, as it did in opposing Esperanza's viewpoint arguments, the City trots out *Bowers v. Hardwick*. Again, the City completely misses the point. *Bowers* was a Fourteenth Amendment due-process case, not an equal-protection case. 487 U.S. at 196 & n. 8, 108 S.Ct. 2320. Whether public sentiments about the morality of homosexual sexual relations provide a rational basis in support of a law criminalizing those relations is obviously not a question raised by the present case. This case is not about sexual relations among gays and lesbians. Nor does it involve the due process clause.

Further, as demonstrated by *City of Cleburne* and *Romer*, it is incongruous for the City to argue that public sentiment against homosexuality provides any sort of rational basis for council's decision to defund plaintiffs. In *Romer*, the one Supreme Court case where public opposition to homosexuality was offered as a reason for differential treatment against an equal protection challenge, the Court held that public opposition to homosexuality did not justify governmental action. *Romer*, 517 U.S. at 635, 116 S.Ct. 1620.[144] Instead, the Court held that governmental action based on such opposition raises "the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Id.*

The City then offers the hypothetical of neo-Nazi art, arguing that if it must fund Esperanza, we start down the slippery slope that leads to City-funded display in public forums of art "glorif[ying] Hitler, . . . advocating that the Holocaust was fictitious, and [showing] Holocaust victims befouled with swastikas." [145] As plaintiffs point out, nothing in the arts-funding criteria requires the City to "display" any artwork. In addition, it is highly doubtful that such art would meet the City's standards of artistic excellence and audience development. But if it did, the City could not deny funding merely because constituents disapproved of the organization's views.

We live in a society where we are daily exposed to viewpoints, ideas, and images we do not agree with, and often to those that shock, offend, or anger us. This is but the price we must pay for a free society that encourages an open and educated debate on matters of public importance. The Ku Klux Klan may hold a parade, and a demonstrator may burn an American flag as a symbol of protest. The fact that onlookers may find these expressions of viewpoint objectionable is not a reason to curtail the speakers' rights of free expression and assembly. " '[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional pro-

individual council members. *See* Plaintiffs' brief at 28–29.

143. Defendants' brief at 19.

144. "The primary rationale the State offers for Amendment 2 is respect for other citizens' freedom of association, and in particular the liberties of landlords or employers who have personal or religious objections to homosexuality . . . . We cannot say that Amendment 2 is directed to any identifiable legitimate purpose

or discrete objective. It is a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests; it is a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit. . . . Amendment 2 violates the Equal Protection Clause." *Romer*, 517 U.S. at 635, 116 S.Ct. 1620.

145. Defendants' brief at 20.

tection.' " *Hustler Magazine v. Falwell,* 485 U.S. 46, 55, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (quoting *FCC v. Pacifica Foundation,* 438 U.S. 726, 745, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978)). *See also Texas v. Johnson,* 491 U.S. at 414, 109 S.Ct. 2533 (flag burning); *Cohen,* 403 U.S. at 22–23, 91 S.Ct. 1780 (protest of selective service law by use of four-letter expletive); *Terminiello,* 337 U.S. at 4–5, 69 S.Ct. 894 (virulent ethnic and religious epithets); *Christian Knights of the Ku Klux Klan v. District of Columbia,* 972 F.2d 365, 369–71 (D.C.Cir.1992) (Ku Klux Klan march).

The City mentions that the council's perception of Esperanza as a political group offers a rational basis for its defunding decision. Just as the expression of political ideas cannot justify viewpoint discrimination, it likewise cannot serve as a rational basis for differential treatment.[146]

Finally, the City offers "back-to-basics" priorities and the desire among council members to reach a consensus on the budget as rational bases for treating plaintiffs unlike other similarly-situated arts groups. A city council may take money from arts groups and allocate it to basic services. Such a decision is rationally related to the goal of providing good roads, adequate fire and police protection, and other necessary services. Yet, even though a court must defer to the legislative decision and not pass on its wisdom or desirability, the court must still examine how the classification adopted (here, providing no funding for plaintiffs) relates to the object to be attained (providing greater basic services to the public). *Romer,* 517 U.S. at 632, 116 S.Ct. 1620. A court must review the "fit" between ends and means when judg-

ing the rationality of government acts. *Brennan v. Stewart,* 834 F.2d 1248, 1259 (5th Cir.1988). "The search for the link between classification and objective gives substance to the Equal Protection Clause; it provides guidance and discipline for the legislature, which is entitled to know what sorts of laws it can pass; and it marks the limits of [the courts'] authority." *Id.*

Here it cannot be said that defunding plaintiffs is rationally related to the legitimate purpose of providing more or better basic services to the citizens of San Antonio: The City's budget office prepared alternatives for council members that included an across-the-board cut for all recommended arts agencies, but the council instead chose to eliminate all funds for plaintiffs, while applying the across-the-board cut to the remaining arts organizations.[147] The "back to basics" rationale does not provide any explanation of how the differential treatment of plaintiffs was rationally related to the legitimate purpose of increasing "basic" funding. Council members could not justify their decision to eliminate plaintiffs' funding completely rather than imposing a greater across-the-board cut on the entire arts budget, including plaintiffs.[148] Indeed, it is not completely clear whether plaintiffs' funding allocation was actually applied to basic services at all.[149] Similarly, while it may be legitimate for a government to seek consensus among elected officials, the desire for consensus does not provide a rational answer to the question of how consensus was achieved by singling out plaintiffs for unequal treatment.

---

146. Similarly, as discussed above, Esperanza's perceived "offensive" or "aggressive" lobbying style does not offer a rational basis for its unfavorable treatment.

147. PX 36; TR 322–23.

148. TR 255 (Flores), 275–76 (Menendez), 353 (Guerrero), 382 (Vasquez), 476 (Prado).

149. PX 113; TR 328, 347–48, 362, 382.

Thus, none of the City's justifications provide a rational basis for the City's defunding of plaintiffs. The City violated plaintiffs' equal protection rights when it denied their funding.

## IV. Retaliation.

■ Plaintiffs' retaliation claim is based on their contention that the City refused to award plaintiffs grants in September 1998 in retaliation for their filing this suit in August 1998. To succeed on their retaliation claim, plaintiffs must show that their conduct was constitutionally protected and that their conduct was a substantial or motivating factor in the council's decision not to fund them. *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. 568; *Jones II*, 874 F.2d at 1067. If plaintiffs satisfy this burden, the burden shifts to the City to prove that the same decision would have been reached regardless of the protected conduct. *Id.*

Plaintiffs have met their first burden; they engaged in constitutionally-protected conduct when they filed this lawsuit. *Wilson v. Thompson*, 593 F.2d 1375, 1386 (5th Cir.1979).

Plaintiffs next must prove that their constitutionally-protected conduct was a substantial or motivating factor in the defunding decision. Both Esperanza and the Media Project applied for grants for fiscal year 1998–99, and on July 28, 1998, following favorable peer review and DACA staff evaluations, the CAB voted to recommend operational support for Esperanza.[150] The Media Project was also rated favorably by the peer review panel and the DACA staff and was initially recommended for funding

by the CAB.[151] Plaintiffs filed this suit on August 4, 1998. That evening, City Attorney Frank Garza announced during an interview on television that the City maintained a policy of refusing to fund any entity that sues the City.[152] In that interview, Garza said that Esperanza could not be considered for renewed funding because of a City policy that forbids funding to any organization pursuing litigation against the City.[153] On September 2, 1998, the CAB called a special meeting with Assistant City Attorney Tom Bailey to ask him if there was a policy against funding entities litigating against the City. Bailey met with CAB members in a closed session and explained that "if an organization had litigation against the city, they were not eligible for funding." [154] Following the closed session, in public session, CAB Chair Grace Rose Gonzales asked Graciela Sánchez, Executive Director of the Esperanza Center, whether Esperanza would drop its lawsuit against the City in light of the City's policy. Sánchez responded that Esperanza would not drop its lawsuit.[155] The CAB then voted to withdraw its funding recommendation for Esperanza because of the City's policy.[156] At a regular city council meeting the next day, DACA Director Eduardo Diaz told the city council that withdrawal of the funding recommendation for Esperanza was made upon the city attorney's advice due to the pending federal litigation Esperanza filed against the City.[157]

In a prepared statement read during the September 17, 1998 city council meeting, immediately before the council was to vote

150. TR 114.

151. PX 88.

152. PX 89; TR 115.

153. PX 89.

154. PX 96; Undisputed fact 62.

155. TR 115–16.

156. TR 118; Undisputed fact 63.

157. PX 97.

on the fiscal year 1998–99 city budget, City Attorney Frank Garza stated:

> Mayor, there has been discussion regarding the impact of litigation on proposed arts funding and I want to make it clear that city council is free to consider the original cultural advisory board recommendation. Filing a lawsuit by a delegate agency against the city cannot be utilized as the sole factor for denying someone arts funding in this year or future years. There are factors that the council can consider when deciding whether or not to fund an agency. Some of those factors are cost efficiency of past programs, the number of people who are attracted per cost, past performance of previous contracts, reprioritizing programs that the council may have, artistic merit, as well as ability to attract cultural tourism which are some of the reasons that can be utilized.[158]

After Mr. Garza read his statement, the city council did not reconsider or discuss the CAB's elimination of funding for Esperanza and the Media Project.[159] The council then voted to approve the proposed budget, without any change to the CAB's reversal of its recommendation concerning Esperanza.[160] The City subsequently altered its contracts requiring arts agencies funded in the fiscal year 1998–99 budget to sign a rider that states: "Grantee, at the City's option, could be ineligible to receive any future funding while any adversarial proceeding against the City remains unresolved." [161]

As the City points out, the council was unequivocally advised prior to its vote on the fiscal year 1998–99 budget that Esperanza's lawsuit could not be considered as the sole basis for denying arts funding. Further, a majority of council members directly testified that Esperanza's lawsuit had no effect on their decision.[162] Only two testified that the suit played some part.[163]

Plaintiffs argue that despite City Attorney Garza's September 17 statement to the council and the testimony of a majority of the council that the suit played no part in their funding decision in 1998, "the overwhelming evidence" indicates that the lawsuit was at least a substantial or motivating factor. The Court does not agree. Prior to the September 17 statement by City Attorney Garza, the evidence was indeed overwhelming that the City's policy would have played a substantial or motivating part. But prior to the actual vote, Garza informed the council that it was free to consider the original CAB recommendation, and that Esperanza's lawsuit could not "be utilized as the sole factor for denying someone arts funding . . . ." Then the vote was taken, and seven council members have indicated that the suit played no part in their decision.

At the very least, the testimony of a majority of the council that the lawsuit did not affect their vote is evidence that the City would have made the same decision regardless of the lawsuit. The Court credits their testimony. It is apparent from the evidence discussed above concerning viewpoint discrimination and equal protection that these council members had made up their mind about Esperanza, and that

**158.** PX 98.

**159.** PX 98.

**160.** PX 98.

**161.** PX 70; TR 209, 210, 212.

**162.** TR 312 (Webster), 384 (Vasquez), 426 (Peak), 463 (Garza), 475 (Prado), 508 (Bannwolf); PX 90 (Marbut).

**163.** TR 269 (Menendez), 353 (Guerrero).

they would not have voted to fund it even if it had not sued the City.

## V. Texas Open Meetings Act.

Plaintiffs argue that the City violated the Texas Open Meetings Act by a series of "meetings" held on the evening of September 10, 1997 (the evening prior to the next day's vote on the budget), and by Mayor Peak's telephone calls to council members the same evening. Plaintiffs contend that the meetings and phone calls led to the consensus memorandum issued by the Mayor prior to the September 11 city council meeting, and signed by all council members.

There are ten council members plus the mayor. Thus, a quorum is six. On the night of September 10, 1997, the eve of the budget vote, the Mayor, the City Manager, and several council members met in small groups in the City Manager's office to discuss the budget.[164] While meeting in person with the various members, the Mayor also spoke on the telephone with other members. The Mayor's purpose in meeting with the members was to reach a consensus on changes to the city budget; he wanted to avoid "a whole bunch of amendments from the floor that would take up lots of time" during the next day's open meeting.[165] There was never the possibility of a physical quorum, as only four council members in addition to the mayor were present.[166] Webster and Guerrero were not present.[167] Bannwolf, Prado, and Marbut, however, spoke with the Mayor on the telephone, and Bannwolf recalled possibly being on a speaker phone,[168] so the possibility exists that a quorum could have been present. Indeed, the participants were careful to avoid the physical presence of a quorum. On several occasions throughout the evening, the City Manager told the group that there were too many people together, and they were at risk of violating the Open Meetings Act.[169] In response to the City Manager's warnings, one or more council members would leave the office and wait in the reception area outside.[170] As individuals moved in and out of the City Manager's office, the conversation in the office continued regarding the budget.[171]

No public notice was posted for a meeting of the city council for that evening.[172] The closed deliberations led to unanimous agreement on a series of budget changes, including the elimination of all funding for the plaintiffs.[173] Mayor Peak said that when he left City Hall that night, the budget problems were mostly all solved.[174] All council members signed a final draft of the consensus memorandum prepared by Mayor Peak before the open meeting on September 11, 1997.[175] The memorandum set forth amendments to the proposed budget, including a 15 percent across-the-board reduction in arts funding and the complete elimination of the funding desig-

164. Undisputed fact 47.

165. TR 411, 415.

166. TR 423–26 (Peak), 234–37 & 242–43 (Flores), 271–73 (Menendez), 387–89 (Vasquez), 450–52 (Garza).

167. TR 312–13, 365.

168. TR 467–69 & 471–72 (Prado), 504–05 (Bannwolf); Marbut deposition at 85–88.

169. TR 242, 256, 272, 424.

170. TR 234, 242.

171. TR 255.

172. Undisputed fact 46.

173. TR 321.

174. TR 425–26.

175. PX 35; Undisputed fact 48.

nated for plaintiffs.[176] The agreed changes were incorporated into the proposed budget by the budget office prior to the open meeting and formal vote on September 11, 1997. Most of the changes deliberated in those meetings were never publicly debated.[177] No mention of the elimination of funding for plaintiffs was made by any council member at any open meeting prior to the September 11 vote.[178] No council member recalled who initially made the proposal to eliminate plaintiffs' funding or when it was made.[179] The Mayor's September 11, 1997 memorandum contains no explanation why plaintiffs were singled out for defunding.[180]

The council members understood the memorandum was not binding, and that any of them could have moved to change the proposed budget or the items contained in the memorandum during the council meeting.[181] None did. There were no amendments offered at the September 11 public meeting and no debate.[182] The budget adopted essentially reflected the agreement in the consensus memorandum.[183]

■ The Texas Open Meeting Act requires that "[t]he executive and legislative decisions of our governmental officials as well as the underlying reasoning must be discussed openly before the public rather than secretly behind closed doors." *Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 300 (Tex.1990). The Act requires "openness at every stage of a governmental body's deliberations." *Id.* Because citizens are entitled to know not only what government decides but to observe how and why

every decision is enacted, exact and literal compliance with the terms of the Open Meetings Act is demanded. *Id.* "The Open Meetings Act was promulgated to encourage good government by ending, to the extent possible, closed-door sessions in which deals are cut without public scrutiny." *Save Our Springs Alliance, Inc. v. Lowry*, 934 S.W.2d 161, 162 (Tex.App.Austin 1996, orig. proceeding) (citing *Cox Enters., Inc. v. Board of Trustees of Austin Indep. Sch. Dist.*, 706 S.W.2d 956, 960 (Tex.1986) ("The Act is intended to safeguard the public's interest in knowing the workings of its governmental bodies.")). Provisions of the Act should be liberally construed to effect its purpose. *Finlan v. City of Dallas*, 888 F.Supp. 779 (N.D.Tex. 1995).

This spirit is embodied in the Act's general rule that every regular, special, or called meeting of a governmental body shall be open to the public unless otherwise provided by the statute. TEX. GOV'T CODE ANN. § 551.002.

The word "meeting" is defined as:

a deliberation between a quorum of a governmental body, or between a quorum of a governmental body and another person, during which public business or public policy over which the governmental body has supervision or control is *discussed or considered* or during which the governmental body takes formal action . . .

TEX. GOV'T CODE ANN. § 551.001(4) (emphasis added). The Act defines "deliberation" as "a verbal exchange during a meeting

---

176. PX 35; Undisputed fact 48.

177. PX 51–53.

178. Undisputed fact 45.

179. TR 306, 365, 414, 502–03.

180. PX 35.

181. TR 248–51, 274, 329–30, 365, 379.

182. PX 53.

183. TR 251, 380.

between a quorum ... concerning an issue within the jurisdiction of the governmental body or any public business." *Id.* at § 551.001(2).

The City argues that no violation occurred because no quorum was ever present in the City Manager's office on the 10th. The Texas Attorney General, relying on a San Antonio Court of Appeals case, has taken the opposite view. The Attorney General opined that a legislative body can violate the Act when it "deliberates through a series of closed meetings of members of less than a quorum." Op. Tex. Att'y Gen. No. DM–95 (1992).[184] The opinion concerned a letter circulated among members of a city council and signed by a quorum of the members. The Attorney General concluded that if a quorum agrees on a joint statement on a matter of governmental business or policy, the deliberation by which the agreement is reached is subject to the Act's requirements, and those requirements are not necessarily avoided by the fact that a quorum was not physically present in one place at one time. The attorney general relied in part on *Hitt v. Mabry*, 687 S.W.2d 791, 796 (Tex.App.San Antonio 1985, no writ) in which the court upheld an injunction restraining the San Antonio Independent School District board of trustees from arriving at a decision affecting the District by way of private, informal telephone polls or conferences of the board members. The attorney general has also opined that a city council member violates the Act when he telephones individually a quorum of the council members to express his views about public business that has not been formerly considered by the council in an open session. Op. Tex. Att'y Gen. No. LO–95–055 (1995). The Attorney General concluded, "[a]voiding the technical definition of 'meeting' or 'deliberation' is not, therefore, a foolproof insulator from the effect of the act. Indeed, it would appear that the legislature intended expressly to reach deliberate evasions of these definitions in enacting [§ 551.143(a) [185]] of the act." *Id.*

The Texas Attorney General publication, "The Texas Open Meetings Act Made Easy," addresses the question, "Can a quorum of city council members sign a group letter or other document without violating the Open Meetings Act?" The Office of the Attorney General responds:

> It remains a fact issue whether the presence of signatures by council members on a group letter or within another document constitutes a violation of the open meetings laws.... [I]f council members met in numbers less than a quorum regarding the document with the specific intent of circumventing the purposes of the Act, a violation of the Open Meetings Act would ... have occurred.[186]

In considering whether a gathering of less than a quorum of city officials may be subject to the Act, the publication goes on to opine that:

---

**184.** The Attorney General's opinions construing the Open Records Act are not binding on the courts, but are accorded great weight because the legislature has specifically delegated to the Attorney General the duty of interpreting the Act and aiding in its enforcement. *Heard v. Houston Post Co.*, 684 S.W.2d 210, 212 (Tex.App.Houston [1st Dist.] 1984), writ ref'd n.r.e.; *Austin v. City of San Antonio*, 630 S.W.2d 391, 394 (Tex.App.San Antonio 1982, writ ref'd n.r.e.).

**185.** That section makes it a criminal offense for a member or group of members of a governmental body to knowingly conspire to circumvent the Act by meeting in numbers less than a quorum for the purpose of secret deliberations in violation of the Act.

**186.** Defendants' Information Regarding the Open Meetings Act (docket no. 160), item 25 at 15.

State law also provides that if less than a quorum of city official [sic] gather with the intent of circumventing the purposes of the Open Meetings Act, criminal penalties can be imposed against the participating officials. In other words, if city council members are holding their discussion of public business in numbers less than a quorum in order to avoid having to meet the requirements of the Open Meetings Act, criminal prosecution can be pursued against such officials for such discussions.[187]

A leading expert on the Texas Open Meetings Act, Alan J. Bojorquez, former Assistant General Counsel for the Texas Municipal League, writes:

If a quorum of a governmental body agrees on a joint statement on a matter of governmental business or policy, the deliberation by which that agreement is reached is subject to the requirements of the Open Meetings Act, and those requirements are not necessarily avoided by avoiding the physical gathering of a quorum in one place at one time.[188]

Acknowledging the preceding authority, the City argues that whether the Act is violated in these situations "depends entirely on the specific fact pattern." [189] Surely the facts of this case present a classic fact pattern of deliberation by a quorum that purposely attempts to avoid the technical definitions of the Act by shuffling members in and out of an office. Clearly, a quorum of council members deliberated and reached agreement concerning the budget—perhaps the most important piece of public business the council considers—behind closed doors, actions condemned by both the *Hitt* court and the Texas Attorney General. The transparent subterfuge of separating members physically by an office wall or a telephone line cannot avoid the strictures of the Act.

At lest one other state court in Texas has addressed this situation. In *Harris County Emergency Serv. Dist. No. 1 v. Harris County Emergency Corps.*, 999 S.W.2d 163 (Tex.App.Houston [14th Dist.] 1999, no pet.), the court refused to enjoin board members from discussing district business over the telephone because the evidence did not show that a quorum was involved in the discussions or that the conversations were a meeting. *Id.* at 169. The court distinguished *Hitt* because the evidence in *Harris County*, unlike that in *Hitt*, did not show that a quorum of the board ever discussed policy or public business over the phone or that telephone polling occurred. *Id.* Therefore, unlike *Hitt*, there was no evidence that the members were attempting to circumvent the Act by using the telephone to avoid meeting in a quorum. *Id.* Obviously, the present case is a *Hitt* case, not a *Harris County* case.

Courts in other jurisdictions have reached the same conclusion as the *Hitt* court. In *Brown v. East Baton Rouge Parish Sch. Bd.*, 405 So.2d 1148, 1155–56 (La.App.1981), the court recognized the "walking quorum" concept. That is, an overlapping series of meetings or telephone conferences could establish the factual basis for a "walking quorum" even if a quorum of members was not in the same room at the same time. Based on the evidence before it—only six of the 12 board members were present in one board member's office, that no other board members were in the hall or contacted by telephone or otherwise, that none of those

---

187. *Id.* at 16.

188. *Id.* at item 31 at 3 (citing Op. Tex. Att'y Gen. No. DM–95 (1992)).

189. Defendants' brief at 24 n. 7.

present left the meeting, and no others arrived during the meeting—the court concluded that an illegal closed meeting had not taken place. *Id.* at 1156. In *Booth Newspapers, Inc. v. University of Mich. Bd. of Regents,* 444 Mich. 211, 507 N.W.2d 422 (1993), the defendant board of regents conducted a series of closed meetings, telephone calls, and informal meetings in narrowing its choices for a new president of the university, culminating in a choice of one candidate who was recommended for the position. 444 Mich. at 216–220, 507 N.W.2d 422. At that point, the board of regents conducted a public meeting at which the single remaining candidate was formally selected. *Id.* at 220, 507 N.W.2d 422. The Michigan supreme court found that, by narrowing the list of candidates to one name, the board of regents had effectively made its decision behind closed doors, and merely announced the decision at the public meeting, which the court described as "a fait accompli." *Id.* at 229, 507 N.W.2d 422. The Court found that these actions violated the Michigan open meetings act, which requires that all "decisions" be made at a public hearing. Similarly, in *State ex. rel. Cincinnati Post v. Cincinnati,* 76 Ohio St.3d 540, 668 N.E.2d 903 (1996), the city manager on three different days called three series of back-to-back meetings with groups of council members. The meetings were held in his office in private. At no session was a quorum of members present. At these meetings the manager discussed the county's proposal for building new stadiums for the city's professional baseball and football teams. The manager testified that the reason for the small meetings was "so we wouldn't violate Ohio['s] Open Meetings Law." *Id.* at 904. The Ohio supreme court held that the open meetings act prohibits "such maneuvering to avoid its clear intent." *Id.* at 906. The court said:

To find that Cincinnati's game of "legislative musical chairs" is allowable under the Sunshine Law would be to ignore the legislative intent of the statute, disregard its evident purpose, and allow an absurd result. The statute['s] ... very purpose is to prevent just the sort of activity that went on in this case—elected officials meeting secretly to deliberate on public issues without accountability to the public.... To rule in Cincinnati's favor would be to endorse the behavior undertaken by city council and the city manager in this case and make it applicable to every city council meeting in Ohio. The statute that exists to shed light on deliberations of public bodies cannot be interpreted in a manner which would result in the public being left in the dark. The Ohio Sunshine Law cannot be circumvented by scheduling back-to-back meetings which, taken together, are attended by a majority of a public body.

*Id.* See also *Roberts v. City of Palmdale,* 5 Cal.4th 363, 376, 20 Cal.Rptr.2d 330, 853 P.2d 496 (1993) ("concerted plan to engage in collective deliberation" serially would violate the open meeting requirement (dictum)); *Stockton Newspapers, Inc. v. Redevelopment Agency,* 171 Cal.App.3d 95, 102, 214 Cal.Rptr. 561 (1985) (series of nonpublic telephone conversations, each between a member of the governing body and its attorney, for the commonly agreed purpose of obtaining a collective commitment by a majority of that body concerning public business, constitutes a "meeting" and thus violates the open meetings act); *Del Papa v. Board of Regents of the University and Community College System of Nevada,* 114 Nev. 388, 392, 956 P.2d 770, 778 (1998) (quorum of a public body gathered by using serial electronic communication to deliberate toward a decision or to make a decision on any matter over which the body has supervision, control, jurisdiction

or advisory power violates open meeting law).

It may be argued that finding an Open Meetings Act violation in this case will impair informed and efficient decision-making. That is, government decision-makers must be free to consult among themselves in a candid and unrestrained manner in an attempt to persuade each other and resolve issues.

> Inherent in an executive position is the duty to make rational decisions and to take responsibility for the consequences. Important decisions should not be made casually, but informal information may be as important as formal procedure in reaching the correct result, whether the decision needs to be rational, representative, or efficient.

*Hispanic Educ. Comm. v. Houston Indep. Sch. Dist.*, 886 F.Supp. 606, 610 (S.D.Tex. 1994). How does one square this requirement of responsible and efficient government with the dictates of the Open Meetings Act, which require "openness at every stage of a governmental body's deliberations"? *Acker*, 790 S.W.2d at 300. The answer may lie within the *Hispanic Educ. Comm.* case. There the court held that a school district board of trustees, meeting in numbers less than a quorum to discuss the hiring of a board member as superintendent, did not violate the Texas Open Meetings Act. The court observed that "[l]imiting board members' ability to discuss school district issues with one another outside of formal meetings would seriously impede the board's ability to function." 886 F.Supp. at 610. In reaching its decision, the court reasoned that "[w]ith fewer than a quorum present, nothing can be formally decided; without a formal decision, no act is taken. Without action, there is no illegality." *Id.* The court also

observed that there was no evidence of any systematic attempt to circumvent or avoid the purposes of the Act. *Id.* The clear implication from this is that if there had been, the court would have found a violation of the Act regardless of whether the quorum requirement was met. *See also Harris County Emergency Serv. Dist. No. 1*, 999 S.W.2d at 169 (no evidence that the members were attempting to circumvent the Act by using telephone to avoid meeting in a quorum). Such an approach balances the Act's "quorum requirement" against the need to prevent circumvention of the Act by conducting public meetings in a piecemeal fashion without a quorum being present. If a governmental body may circumvent the Act's requirements by "walking quorums" or serial meetings of less than a quorum, and then ratify at a public meeting the votes already taken in private, it would violate the spirit of the Act and would render an unreasonable result that was not intended by the Texas legislature. Thus, a meeting of less than a quorum is not a "meeting" within the Act when there is no intent to avoid the Act's requirements. On the other hand, the Act would apply to meetings of groups of less than a quorum where a quorum or more of the body attempted to avoid the purposes of the Act by deliberately meeting in groups of less than a quorum in closed sessions to discuss and/or deliberate public business, and then ratifying their actions as a quorum in a subsequent public meeting.

Here, the intent is clear. The Mayor met and spoke with groups of council members of less than a quorum to reach a "consensus,"—that is, to arrive at a majority decision on the budget—prior to the formal meeting.[190] The City Manager kept track of the number of council members present so that a formal quorum

---

**190.** TR 410–11.

would not be together in his office.[191] The consensus reached was memorialized in the consensus memorandum containing the signatures of each council member, and manifested when the council adopted the budget set forth in the memorandum at the next day's public meeting—a "fiat accompli." A clearer manifestation of intent to reach a decision in private while avoiding the technical requirements of the Act can hardly be imagined. "When a majority of a public decisionmaking body is considering a pending issue, there can be no 'informal' discussion. There is either formal consideration of a matter in compliance with the Open Meetings Act or an illegal meeting." *Acker*, 790 S.W.2d at 300. Or, as a California court put it,

> In this area of regulation, as well as others, a statute may push beyond debatable limits in order to block evasive techniques. An informal conference or caucus permits crystallization of secret decisions to a point just short of ceremonial acceptance. There is rarely any purpose to a nonpublic pre-meeting conference except to conduct some part of the decisional process behind closed doors. Only by embracing the collective inquiry and discussion stages, as well as the ultimate step of official action, can an open meeting regulation frustrate these evasive devices.

*Sacramento Newspaper Guild v. Sacramento County Bd. of Supervisors*, 263 Cal. App.2d 41, 50, 69 Cal.Rptr. 480, 487 (1968).

■■■ Having found an Open Meetings Act violation, the Court must consider whether the council's adoption of the budget at a properly convened open meeting will excuse that violation. Governmental actions taken in violation of the Act are subject to judicial invalidation. *See Smith County v. Thornton*, 726 S.W.2d 2, 3 (Tex. 1986) (commissioner's court actions of closing county road and deeding it to adjacent business taken at illegally convened meeting declared void); *Lower Colo. River Auth. v. City of San Marcos*, 523 S.W.2d 641, 646 (Tex.1975) (river authority's attempt to increase electric power rates at illegally convened meeting held to be void); *City of Fort Worth v. Groves*, 746 S.W.2d 907, 915 (Tex.App.Fort Worth 1988, no writ) (commissioners court action of formulating lease agreement at illegally convened meeting held to be void).

■■■ A governmental entity may ratify only what it could have lawfully authorized initially. *Ferris v. Texas Board of Chiropractic Examiners*, 808 S.W.2d 514, 518 (Tex.App.Austin 1991, writ denied); *Porth v. Morgan*, 622 S.W.2d 470, 475–76 (Tex.App.Tyler 1981), writ ref'd n.r.e.. In *Ferris*, the Board of Chiropractic Examiners attempted to terminate its executive director at two meetings that it later admitted did not comply with the provisions of the Open Meetings Act. 808 S.W.2d at 515. The court held that because the board's attempted termination of the director at these meetings was void, the board could not later ratify those acts at a properly convened meeting. *Id.* at 518. Similarly, in *Porth*, a hospital authority board elected a director at a meeting held in violation of the Act. Ten days later, the hospital authority board attempted to elect the director as vice chairman of the board at a legally convened meeting. The court held that the board had no power to act at a meeting not convened in accordance with

---

**191.** As plaintiffs point out, there is some irony in the Mayor's testimony that, while he was working hard to achieve a consensus that would avoid lengthy deliberations at the open meeting, he apparently believed that the Act applied to decision-making. Peak testified that the City Manager "made sure we stayed within the numbers so that we weren't making a decision." (TR 424.)

the Act, and therefore, it could not later ratify the act. 622 S.W.2d at 476. *See also* Op. Tex. Att'y Gen. No. LO–95–055 (1995) (violations caused by deliberations that did not comply with the Act cannot be cured by repeating the deliberations in an open meeting held in compliance with the Act).

While actions committed in violation of the Act may not later be ratified, the same actions may be taken in a properly convened meeting. In *Lower Colo. River Auth.*, the supreme court held that the river authority's board of directors may not initially increase rates at an illegally convened meeting and then later ratify the rate increase effective as of the date of the illegally convened meeting. 523 S.W.2d at 646–47. The board was free, however, enact the rate increases at the properly convened meeting, but they would be effective only as of the date of that meeting. *Id.* at 647. *See also Ferris,* 808 S.W.2d at 515 (while board could not ratify termination as of the dates of the improper meetings, board did terminate the director as of the date of the properly convened meeting).

In the present case, it is apparent from the record that what occurred at the September 11, 1997 city council meeting was a mere ratification of the deal already struck in closed deliberations the day before. No deliberations occurred at the open meeting; those had already occurred in private.[192] The council merely confirmed the deal already memorialized in the consensus memorandum. As the council had no power to deliberate and vote on the budget at a meeting not convened in accordance with the Act, it could not later ratify the void act at a properly convened meeting. *Porth,* 622 S.W.2d at 476; Op. Tex. Att'y Gen. No. LO–95–055 (1995). The attempted ratification was ineffective, and the council's defunding of plaintiffs is void. *Lower Colo. River Auth.,* 523 S.W.2d at 647.

To hold otherwise would permit a governmental body convened in accordance with the Act to "rubber stamp" deliberations and decisions already made in violation of the Act. It would also allow evisceration of the Act's worthy goals of ensuring the public's right to know what decisions government officials make and to have those officials articulate fully the basis on which they act. As the Texas Supreme Court has explained, the Open Meetings Act "recognized the wisdom contained in the words of Justice Brandeis that: 'Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.'" *Acker,* 790 S.W.2d at 300 (citing LOUIS BRANDEIS, OTHER PEOPLE'S MONEY 92 (1914 ed.)). The goal of efficient government should not be used as an excuse to pull down the shade the Act has raised. To lower that shade and blot out the sunlight in the name of efficiency would promote only more "efficiency." The demarcation between efficiency and compliance with the purposes and spirit of the Open Meetings Act is properly defined by the Texas Legislature, and it is within the legislature's sole discretion to amend the Act. The Court, however, under the specific facts of this case, finds that the council violated the Act.

## VI. Damages.

Plaintiffs request damages in the amount of the arts funding grants lost as a consequence of the City's constitutional violations, including grants through fiscal year 2000–2001, and injunctive relief that will protect against the City's use of viewpoint discrimination and animus-based discrimination in the future. The City con-

192. PX 53.

tends that the only remedy available for a constitutional violation is compensatory damages in the form of lost grant monies based on the recommended awards (rather than the requested awards) for 1997 and 1998, less any mitigated amounts.

In regard to the Open Meetings Act violations, plaintiffs ask that the Court require the City to reinstate the grants wrongfully denied, and to enter an injunction restraining the City from implementing arts funding decisions deliberated in closed meetings in violation of the Act. Plaintiffs also seek attorneys fees under TEX. GOVT. CODE § 551.142. In addition, plaintiffs ask that the City be required to disclose the contents of all closed deliberations regarding arts funding in 1997 and 1998, so that it does not enjoy ongoing benefits from their violation by further withholding evidence relevant to this litigation.

The City contends that under the Open Meetings Act, plaintiffs' only recourse is "an action by mandamus or injunction to stop, prevent, or reverse a violation." TEX. GOV'T CODE § 551.142. But the City also notes the existence of authority awarding compensatory damages for violations of the Act. *See Ferris,* 808 S.W.2d at 518 (employee terminated in violation of open meetings act recovered back pay). The City argues that, at most, plaintiffs' 1997 damages would be the amount that plaintiffs would have received during the time period of the unauthorized action.

Neither side provided any useful briefing on the issue of damages, which was just as well because we concentrated during the trial on evidence of possible constitutional and Open Meetings Act violations. Thus, the Court will require the parties to file supplemental briefs, addressing exclusively the damages to be awarded plaintiffs for the violations found in these findings of fact and conclusions of law.

## VII. Conclusion.

To summarize the Court's holdings: Defendants' decision to defund plaintiffs constituted viewpoint discrimination in violation of the First Amendment, and also violated plaintiffs' equal protection rights guaranteed by the Fourteenth Amendment. Defendants did not retaliate against plaintiffs based on their filing of this lawsuit. Defendants violated the Texas Open Meetings Act, and their attempted ratification at the September 11, 1997 meeting was ineffective.

Nothing in this decision requires that the governing body of a city fund any art. The public funding of art remains within the complete discretion of the city council. Cities may determine the extent and scope of the services they provide, and whether the arts in whatever form will occupy a core role in the life of the city. Cities, not the courts, raise the taxes to fund services, and cities should make the decisions concerning how much, if any, of the public funds will be spent to support art. Once a governing body chooses to fund art, however, the Constitution requires that it be funded in a viewpoint-neutral manner, that is, without discriminating among recipients on the basis of their ideology.

The principles I enforce today ensure that plaintiffs will not be denied access to discretionary funding because the government dislikes their ideas. It should be remembered, however, that First Amendment principles also protect the right of those citizens who oppose funding for the plaintiffs to freely make their own views known.

John Stuart Mill wrote in his essay "On Liberty," "if any opinion is compelled to silence, that opinion may, for aught we can certainly know, be true. To deny this is to assume our own infallibility." JOHN STUART MILL, THREE ESSAYS 65 (Oxford Univ. Press

1975) (1859).[193] Thus, given that one can never be assured of the truth of currently-accepted views, a primary purpose of the First Amendment is to encourage "uninhibited, robust, and wide-open" debate on public issues. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). "[W]hen men have realized that time has upset many fighting faiths, they may come to believe ... that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market." *Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (Holmes, J., dissenting). The quest for truth is promoted by free and open exchange, by a full airing of all sides of an issue, by consideration of every alternative, by access to every mind—by persuasion and not by government fiat. Truth can only be reached by discourse; when ideas are tested on their own merits in free and unfettered debate, truth will ultimately prevail. "That at any rate is the theory of our Constitution." *Id.*

Central to fulfilling this vision is the premise that the government should not regulate or manipulate the terms of the debate, that it should remain neutral. Just as we are rightly cognizant of our own fallibility when we must separate truth from falsehood, we should be even more leery when the government presumes to do it for us. When government may effectively drive certain ideas from the marketplace, the free market disappears leaving in its place a command economy. "To allow the government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth." *Consolidated Edison Co. v. Public Serv. Comm'n*, 447 U.S. 530, 538, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980). Under such circumstances, the contest is fundamentally unfair and the competition of ideas on their merits is vitiated. If the government were thus able to control speech in programs for which it provides some support, "the result would be an invitation to government censorship wherever public funds flow," and "an enormous threat to the First Amendment rights of American citizens and to a free society." *Bd. of Trustees of Leland Stanford, Jr. Univ. v. Sullivan*, 773 F.Supp. 472, 478 (D.D.C.1991). As Justice Brandeis wrote:

> Those who won our independence believed ... that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that ... discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government.

*Whitney v. California*, 274 U.S. 357, 375–76, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring).

---

**193.** In the same essay, Mill expanded on this premise in an oft-quoted passage:

> If all mankind minus one were of one opinion, and only one person were of the contrary opinion, mankind would be not more justified in silencing that one person than he, if he had the power, would be justified in silencing mankind.... If the opinion is right, they are deprived of the opportunity of exchanging error for truth: if wrong, they lose, what is almost as great a benefit, the clearer perception and livelier impression of truth, produced by its collision with error.... We can never be sure that the opinion we are endeavouring to stifle is a false opinion; and if we were sure, stifling it would be an evil still.

John Stuart Mill, Three Essays 23–24 (Oxford Univ. Press 1975) (1859).

Some who read this decision may attempt to characterize it as "pro-gay art." It is not. Neither is it "anti-gay art." Instead it is emphatically "pro expression." No person—gay or straight, male or female, young or old, liberal or conservative, Christian or atheist, white, black, brown or "other"—may be denied the right to self-expression merely because those presently holding political power object to that person's views. The First Amendment, said Judge Learned Hand, "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." *United States v. Associated Press*, 52 F.Supp. 362, 372 (S.D.N.Y.1943).

## ORDER

The parties shall file supplemental briefs addressing the nature and amount of damages to be awarded to plaintiffs, any injunctive or declaratory relief requested, and the legal basis for any recovery. The parties shall support their arguments with references to the evidence in the record. Requests for attorney's fees shall not be addressed in these briefs, but shall be made after entry of judgment in compliance with Local Rule CV–7(i), as amended in 2000.

Plaintiffs shall file their supplemental brief no later than **three weeks** from the date of these findings of fact and conclusions of law. Defendants' response shall be filed **two weeks** after receipt of plaintiffs' brief. Plaintiffs may file a reply within **two weeks** of receipt of defendants' response. Service of these briefs on opposing counsel shall be by fax or hand delivery, no later than the day they are filed with the clerk.

At the conclusion of the Court's review of the briefing and evidence relating to damages, the Court will issue supplemental findings of fact and conclusions of law.